Grant Foster and Barbara Dunn Foster v. Commissioner.Foster v. Comm'rDocket Nos. 84095, 84644, 89864.United States Tax CourtT.C. Memo 1965-246; 1965 Tax Ct. Memo LEXIS 84; 24 T.C.M. (CCH) 1268; T.C.M. (RIA) 65246; September 14, 1965Robert J. Bird, 1000 Connecticut Ave., N.W., Washington, D.C., and Paul E. Waring, for the petitioners. Kenneth G. Anderson, George L. Hudspeth and Marshall H. Barkin, for the respondent. RAUMMemorandum Findings of Fact and Opinion The deficiencies and additions to tax determined by the respondent for each of the taxable years in the notices of deficiencies were as follows: Additions to TaxSec. 293(b)Sec. 294(d)(2)I.R.C. 1939Sec. 294(d)I.R.C. 1939Sec. 6653(b)Sec. 291(a)(1)(A)Sec. 6654(a)YearsIncome TaxI.R.C. 1954I.R.C. 1939I.R.C. 1939I.R.C. 19541949$ 6,522.66$ 3,261.33$ 1,630.67$ 621.69$ 414.46195031,241.9615,620.987,810.492,811.781,874.521951229,890.54114,945.2757,472.6420,690.1413,793.431952406,583.18203,291.59101,660.6836,601.6724,401.111953444,374.92222,187.4688,874.9840,005.6126,670.421954218,670.98109,469.0220,257.941955111,179.3356,190.2363.06195648,830.7424,539.1613.00*87 In amended answers filed by respondent he claims the following increases in the deficiencies and additions to tax determined by him in notices of deficiencies: Additions to TaxSec. 293(b)I.R.C. 1939;Sec. 294(d)Sec. 6653(b)Sec. 291(a)(1)(A)YearsIncome TaxI.R.C. 1954I.R.C. 1939I.R.C. 19391949$120,637.99$ 60,319.00$ 30,159.33$10,857.911950165,879.9882,939.9941,469.9814,929.201951352,297.74176,148.8788,074.4331,706.811952402,407.30201,203.65100,601.8436,216.65195349,863.6824,931.8434,691.274,487.261954407,416.36203,574.6537,686.021955358,444.79178,621.831956439,974.21219,863.48In an amendment to his amended answer respondent claims additional increases in deficiencies and additions to tax for the years 1954 and 1955 as follows: Additions to TaxSec. 6653(b)Sec. 294(d)(1)(A)YearIncome TaxI.R.C. 1954I.R.C. 19391954$ 8,600.00$ 4,300.00$795.501955102,481.0551,240.52The principal question for decision involves the determination of the amounts includable in the gross income of petitioners in*88 each of the years 1949 through 1956 for amounts withdrawn by Grant Foster from the account "Foster Construction, C.A." maintained at the Bank of London & South America, Ltd., New York Agency which were diverted to his personal use. Petitioners have conceded that certain checks drawn by Foster on this account during the taxable years were used by him to make personal expeditures, and respondent has conceded that some of the other checks drawn by Foster on this account during those years were used by him for corporate purposes. The checks in controversy are dealt with in the findings of fact. Other questions presented are (1) whether Grant Foster was a bona fide resident of a foreign country during the period September 1, 1952 through December 31, 1956; (2) whether assessment of any deficiencies in tax for the years 1949, 1950, 1952, 1953 and 1954 are barred by the statute of limitations; (3) whether petitioners are liable for additions to tax for fraud for the years 1949 through 1956; (4) whether petitioners realized unreported rental and interest income in some of the taxable years; (5) whether petitioners are liable for additions to tax for the years 1949 through 1953 for failure*89 to file timely returns for those years; (6) whether petitioners are liable for additions to tax for failure to file declarations of estimated tax for the years 1949 through 1954; and (7) whether petitioners are liable for additions to tax for 1955 and 1956 for underpayment of estimated tax. Respondent concedes that petitioners are not liable for additions to tax under Section 294(d)(2) of the Internal Revenue Code of 1939 for the years 1949 through 1953. Findings of Fact Some of the facts have been stipulated, and, as stipulated, are incorporated herein by reference. Grant Foster and Barbara Dunn Foster, petitioners, were husband and wife during the calendar years 1949 through 1956. Grant Foster will sometimes hereinafter be referred to as the petitioner. For the taxable years 1949, 1950, 1952, 1953 and 1954, joint Federal income tax returns of petitioners were filed with the district director of internal revenue, Baltimore, Maryland. For the taxable years 1955 and 1956, joint Federal income tax returns of petitioners were filed with the Director of International Operations of the Internal Revenue Service, Washington, D.C. Petitioners failed to file any individual Federal income*90 tax return for the taxable year 1951. Grant Foster was born at Fairview, Arizona, on January 10, 1915. He attended high school at McCammon, Idaho. He also resided at Farmington, Utah; Pocatello, Idaho; and San Diego, California, until approximately 1939. On September 14, 1932, he married Anna Neiser (now Mrs. Anna Martin), from whom he was divorced on April 3, 1936. They had one son, Lynn Grant Foster. On January 6, 1943, he married Barbara Dunn of San Diego, California. Two children were born of this marriage: a daughter, Jeannette, born on February 4, 1945, and a son, Michael, born on November 29, 1950. In April, 1939, petitioner went to Venezuela and was employed by the Martin Engineering Company which was engaged in heavy construction work at Maracaibo, Venezuela. He remained in that country working for Martin Engineering Company until August, 1943, first as a heavy equipment operator, and later as a foreman and as job superintendent. In August, 1943, he returned to the United States to volunteer for service in the United States Army. During his Army service he attended the U.S. Army Engineers Officers Training School. In 1944, while in that school, he suffered a training accident*91 which partially paralyzed his left hand. After spending approximately 12 months in various hospitals, he was honorably discharged from the Army about September, 1945. Immediately thereafter, accompanied by his wife and daughter, he returned to work for the Martin Engineering Company in Venezuela as a general foreman of equipment and highway construction, on the maintenance of about 150 miles of roads in the oil fields near Lake Maracaibo, at a salary of $325 per month, plus living expenses. In July, 1946, he resigned from the Martin Engineering Company and went into the construction business, as a sole proprietor, operating under the name of Foster Construction. Foster Construction performed highway construction, asphalt surfacing jobs and airport construction work during the years 1947 through 1949. During this period, Foster Construction also began airport and highway construction projects for oil companies and for the Public Works Department of the Government of Venezuela. For this period, Grant Foster reported, in income tax returns filed with the Government of Venezuela, the following gross income and net income of Foster Construction: Period EndingApril 30,194719481949Gross receiptsBs. 197,000.00Bs. 1,118,832.89Bs. 589,417.34Expenses168,083.00986,792.99572,308.66Net IncomeBs. 28,917.00Bs. 132,039.90Bs. 17,108.68*92 Bs. is an abbreviation for the bolivar, a unit of Venezuelan money. For the years 1949 through 1956, the official rate of exchange between the United States dollar and the Venezuelan bolivar was as follows: One dollarBs. 3.35One bolivar$ .2985For the years 1947, 1948, and 1949, the petitioner reported earned income, for Federal income tax purposes, from his proprietorship, Foster Construction, through April 30, 1949, as follows, on his individual income tax returns: PeriodEndingApril 30,194719481949Net income-Foster Construction * * *$ 9,687.20$44,233.37$5,731.41(individually owned business)Salary withdrawn by owner and charged as6,693.309,871.78business expenseTotal income from business$16,380.50$54,105.15$5,731.41Less - earned income limited by Section3,276.109,871.781,146.28116(a) of IRC to 20% of net profitsTotal U.S. Taxable Income$13,104.40$44,233.37$4,585.13In the early part of 1949, petitioner was approached by a person connected with the Ministry of Public Works in Venezuela. That person, in behalf of himself and two other officials in the Ministry*93 of Public Works, proposed an arrangement whereby Foster's company would profit greatly through contracts with the Venezuelan Government. The three officials consisted of the Director of Highways, The Director of Public Works for the State of Falcon, and the Director of Airports and Ports in the Caracas office of the Ministry of Public Works. The spokesman for the three officials outlined to Foster a program of expansion of highways in Venezuela that was to take place. The plan which he proposed, and which Foster agreed to, contemplated that the three Venezuelans, through their official positions, would see that Foster's company would receive advance information on road contracts and construction projects, special consideration in the award of these contracts, leniency in the matter of inspections of work performed, and prompt issuance of progress payments for work performed. Pursuant to the scheme Foster was to be entitled to withdraw $100,000 a year from the business as his salary, and each of the three Venezuelans was to receive secret payments in cash in an amount up to $100,000 if the enterprise had earnings that were sufficient to warrant such payments. The agreement thus entered*94 into between Foster and the three Venezuelan officials was entirely oral; it was never reduced to writing. In connection with the foregoing plan, Grant Foster thereupon, in February 1949, proceeded to have his solely owned business, Foster Construction, incorporated under the laws of Venezuela. The assets and equipment of Foster Construction were transferred to a newly formed Venezuelan corporation named Foster Construction, C.A. In Venezuela, the initials C.A. stand for "Compania Anonymous", signifying that the stockholders are anonymous since the stock is represented by bearer shares. Under the articles of incorporation of Foster Construction, C.A., the amount of the capital stock was to be 50,000 bolivars, divided into 50 shares of 1,000 bolivars each. Under the articles of incorporation, the following persons were listed as the subscribers of the stock: Number ofPaid-inStockholderSharesCapitalGrant Foster25Bs. 25,000Barbara Dunn Foster2222,000John N. Stone11,000,lAndre' Brunet11,000Christian Priez11,000With respect to the 50,000 bolivars which constituted the paid-in capital of Foster Construction, C.A., Grant Foster*95 obtained the entire amount by a withdrawal from his personal bank account at the Bank of London & South America, Ltd., Caracas, Venezuela, on February 8, 1949. Although the petitioner's wife was listed in the artices of incorporation as a shareholder and as a contributor of paid-in capital to Foster Construction, C.A. in the amount of 22,000 bolivars, she actually had no funds or other financial resources from which she might have obtained such funds. The articles of incorporation of Foster Construction, C.A. provided that the shares of stock were to be payable to bearer, that the capital stock might be increased to 1,000,000 bolivars, and that the president of Foster Construction, C.A. might require the shareholders to pay the remaining 950,000 bolivars capital stock to the corporation in such manner and under such conditions as the president of the company might consider desirable. At all times during the years involved herein, Grant Foster was the president and dominant stockholder of Foster Construction, C.A. The articles of incorporation of the company provided in part as follows, with respect to Foster's authority: * * * The President shall manage corporation affairs and*96 shall have full powers of decision and administration to carry out all kinds of operations; he shall be in charge of the daily conduct of all Corporation affairs, with such powers and duties as are stipulated in the By-laws; he shall be provided with sufficiently broad powers to act on behalf of and obligate the Corporation and to carry out, without limitation, acts or operations relating to its purpose; he shall call regular or special Meetings of Stockholders and shall decide what matters are to be taken up. He shall carry out the decisions adopted by the Meeting of Stockholders; make up the budget of regular expenses and authorize special expenses; prepare the Corporation's balance sheets; he shall sign for the Corporation and obligate it with respect to third parties; he shall execute and sign all documents, correspondence, contracts and documents, and shall accept those executed in favor of the Corporation; he shall draw checks, issue bills of exchange, and any other credit documents; he shall receive and order payment of sums of money; enter into and authorize term or current-account loans; he shall represent the Corporation before courts of justice and other public and administrative*97 officials; he shall confer general and special powers of attorney, with whatever authority may be necessary to represent the Corporation, revoking such powers when he deems it desirable; he may require the shareholders to pay the 950,000 bolivars of the capital authorized by the organization Meeting; moreover, he shall have whatever other powers and functions are accorded to him by the By-laws and Articles of Incorporation and any other powers delegated to him by the Meeting of Stockholders or conferred on him by law. He shall deposit or have deposited one share with the Corporation as security for his administrative actions. In addition, he shall appoint and dismiss Corporation employees and establish their duties and compensation. In practice, Grant Foster was the source of all policy decisions affecting Foster Construction, C.A. Foster himself was in charge of all construction work, financial arrangements, hiring of personnel, purchase of equipment, and procuring contracts for the company. About June 15, 1952, there was a recapitalization of the capital stock of Foster Construction, C.A. The capital stock was increased to 2,273,000 bolivars, divided into 2,273 shares of 1,000*98 bolivars each. Such 2,273 shares were bearer shares. The recapitalization in substance involved merely bookkeeping entries whereby accumulated earnings and profits to the extent of 2,000,000 bolivars were transferred to capital. The capital stock outstanding before and after such recapitalization, therefore, was as follows: Prior to 6/15/52After 6/15/52IncreaseNumber of shares502,2732,223Stated capitalBs. 50,000Bs. 2,273,000Bs. 2,223,000In a petition for increase of capital stock filed with the Venezuelan Government, it was stated by Grant Foster that such recapitalization had been approved by the stockholders of Foster Construction, C.A. In the minutes of the company for the meeting authorizing such recapitalization, it was stated that the following shares were represented at that meeting: Grant Foster25 sharesDr. L. B. Gonzalez10 sharesEugene Sullivan15 shares50 shares Eugene Sullivan, vice president of Foster Construction, C.A., never actually owned 15 shares of the stock of the corporation. He never held more than one share, and that share was held by him solely to authorize him to execute contracts in*99 behalf of the corporation, in Grant Foster's absence, to comply with provisions of Venezuelan law. Dr. L. B. Gonzalez was the Venezuelan lawyer for Foster Construction, C.A. During the period July, 1953, through about May 25, 1956, all the outstanding bearer shares of capital stock of Foster Construction, C.A. were deposited for safekeeping with an attorney, T.A. Whiteside, of Miami, Florida, now deceased, who represented Grant Foster in various transactions. In August, 1954, Grant Foster stated to Jack W. Thornburg, at the time of a substantial financial transaction, that he, Grant Foster, owned Foster Construction, C.A. During the years 1949 through 1956, Foster continued his arrangement with the three officials of the Venezuelan Government, as set forth above. These men kept Foster informed with respect to contemplated and pending road construction projects, and exercised their influence for the company in the Ministry of Public Works in connection with the award of contracts, the inspection of work performed, the prompt processing of estimated payments and progress payments due on contracts, and the obtaining of advances from the Venezuelan Government for operating capital. During*100 these years, petitioner continued to make secret cash payments to these officials in accordance with their agreement. The amounts paid to them were not reflected in the Venezuelan tax returns filed by Foster Construction, C.A. The making of such payments, or bribes, by Grant Foster to these persons continued up to 1956. However, he had a final settlement with them in 1964, about two months prior to the hearing herein, when he met with two of them by prearrangement in Switzerland, and paid them $600,000 in cash which he withdrew from a Swiss bank account that was maintained for that purpose. In 1953, when Foster Construction, C.A. was engaged in the construction of an 80-mile highway in Venezuela, the Ministry of Public Works caused Foster Construction, C.A. to stop all construction due to charges that the road was not being constructed by the corporation in accordance with plans and specifications. At that time, Grant Foster heard rumors that the Venezuelan Government might confiscate the equipment of Foster Construction, C.A. and funds owed to Foster Construction, C.A. by the Public Works Department amounting to approximately 2,500,000 bolivars. His "friends" in the Venezuelan Government*101 were unable to rectify the situation at that time. The Director of Highways had been removed from his position, and the other two officials were afraid to assist the corporation. In order to obtain the 2,500,000 bolivars withheld by the Venezuelan Government, the assistance of another high-ranking official in the Venezuelan Government, Pedro Estrada, Chief of Secret Police and Assistant to the Dictator of Venezuela, Perez Jiminez, was solicited. Estrada agreed to intervene in the matter, in consideration of a fee measured by a percentage of the funds released to Foster Construction, C.A. by the Venezuelan Government. Estrada did intervene, and secured the release of the funds involved to Foster Construction, C.A. in July, 1954, and it was authorized to resume work on the highway construction project. For his services in obtaining the release of these funds, Foster Construction, C.A. paid Estrada the sum of 880,000 bolivars. With the assistance of the Venezuelan government officials beginning in 1949, Foster Construction, C.A. was very successful in obtaining construction contracts from the Ministry of Public Works for the building of roads and other heavy construction work. It*102 did not obtain any new contracts with the Venezuelan government after 1954, but it completed existing contracts and also, until 1960, was engaged in Venezuela in construction work for oil companies operating in Venezuela. The gross volume of business, in bolivars, during the calendar years 1947, 1948, and part of 1949, when the business was operated by petitioner as a sole proprietor, and during the years ending April 30, 1950 through April 30, 1957, when it was operated by Foster Construction, C.A., was as follows: YearBolivars1947197,000.0019481,118,832.891949 (Jan. thru April)589,417.3419502,121,276.7019517,207,495.8819529,652,938.2119533,407,348.0419542,845,179.4019552,592,285.3819561,342,248.6819573,820,950.18Bank Accounts. During the years 1948 and 1949, when Foster Construction was operated as a sole proprietorship, Grant Foster maintained a personal bank account at the Bank of London & South America, Ltd., Caracas Branch (hereinafter referred to as the Bank of London - Caracas). This account was maintained until about April 1, 1949. On February 2, 1949, Foster withdrew Bs. 50,000 from this bank account at*103 the Bank of London - Caracas and deposited that amount in a new account at the same bank in the name of Foster Construction, C.A. The account "Foster Construction, C.A." at the Bank of London - Caracas was thereafter maintained during the years 1949 through 1956. In addition to this account at the Bank of London - Caracas, the corporation maintained accounts at the Banco de Venezuela (the National Bank of Venezuela), during the period April 1, 1951 through February 6, 1952 and at the Banco Regional de Fomento de Coro (referred to herein as the Coro account). The Coro account was used principally to pay operating expenses of Foster Construction, C.A., such as wages and local purchases, and Foster and one other officer of Foster Construction, C.A. were authorized to draw upon such account. No person other than Grant Foster was authorized to draw upon the account "Foster Construction, C.A." at the Bank of London - Caracas. During the years 1949 through 1956, Grant Foster deposited business receipts of Foster Construction, C.A. in the Bank of London - Caracas account, and made company expenditures from that account for machinery and other purchases in Venezuela. In addition, Foster*104 transferred funds from this account to the Coro account for operating expenses. Foster also withdrew funds from the Bank of London - Caracas for personal purposes during the years 1949 through 1956. Grant Foster also maintained a personal bank account at the Bank of London & South America, Ltd., New York Agency during the period May 1, 1947 to August 2, 1949. On August 2, 1949, this account was closed and the balance of $12,102.32 in that account was transferred to a new account entitled "Foster Construction, C.A." (hereinafter referred to as the New York account) at the same bank. Also on August 2, 1949, $80,000 was transferred to this new account from the account of Foster Construction, C.A. at the Bank of London - Caracas. The only persons authorized to sign checks on the New York account were Grant Foster, president, and Barbara Dunn Foster, vice president. On the signature card, Grant Foster made the following entry: Grant Foster as president is the only person authorized to sign for the firm, except that in his absence the vice president, Barbara Dunn Foster, is authorized to sign. In practice, however, Grant Foster was the only person who ever signed checks on this account*105 during the years 1949 through 1956. He maintained a record or cash book in his own handwriting which he kept in his personal possession; and he periodically entered in that book current information with respect to both the Bank of London - Caracas and the New York accounts, including information as to sources and amounts of deposits, account balances, and the dates, numbers, amounts and payees as to all checks drawn on such accounts. During the period 1949 through 1956, funds were transferred from the account "Foster Construction, C.A." at the Bank of London - Caracas, to the New York account in the following amounts and on the following dates: DateAmount19498/2$ 80,000.008/940,000.008/1540,000.009/950,000.0019503/13$ 30,000.008/23115,000.009/21100,000.0012/1449,999.9019511/9$100,000.004/4100,000.008/3200,000.008/8100,000.0010/11100,000.0011/19100,000.0019521/2$100,000.001/23100,000.005/2200,000.006/27100,000.0010/6400,000.0019531/19$200,000.005/29200,000.007/29100,000.0019542/19$ 50,000.0010/22100,000.0012/1200,000.0019555/25$ 75,000.009/2150,000.0010/11250,000.0019567/25$100,000.0010/2100,000.0011/19200,000.0012/3100,000.00*106 Withdrawals from the New York account. During the period August 2, 1949 through December 31, 1956, 1,109 checks, signed by Grant Foster, were drawn on the New York account. The number of such checks and the amounts thereof by years were as follows: Number ofYearChecksAmount194949$ 79,334.611950161304,724.321951243594,988.711952126633,459.33195384705,326.761954104427,651.271955149724,202.0919561931,732,459.21In determining the deficiencies herein (as modified by the amended pleadings), the Commissioner determined that the following checks (which were included among the foregoing checks) represented withdrawals from the New York account by Grant Foster for his own personal purposes and constituted income to him: Number ofYearChecksAmount194937$ 66,428.34195076174,179.87195183407,636.331952110592,891.03195349633,594.10195476340,839.201955127291,165.861956162222,675.74The remaining checks on the New York account not determined by the Commissioner to be income to Grant Foster, but in effect determined to be expenditures for the benefit*107 of Foster Construction, C.A., were as follows: NumberofYearChecksAmount8/49 to 12/4912$ 12,160.63195085130,105.391951160188,361.8919521641,568.3219533571,732.66195428109,812.45195522258,901.941956431,520,158.27Of the New York account checks determined by the Commissioner to be withdrawals by Grant Foster for personal purposes the Commissioner has since conceded that the following were also for corporate purposes and were not income to Grant Foster: NumberofYearChecksAmount8/49 to 12/4920$25,948.1519503413,441.561951123,484.2219523719,851.11195363,929.691954613,955.351955103,599.5519562765,567.42In addition, of the New York account checks determined by the Commissioner to be withdrawals by Grant Foster for personal purposes, 254 checks totaling $468,590.38, were expended in connection with the cost and operating expenses of the following aircraft: Lockheed Lodestar Navion A-20 Beechcraft - 8980 Beechcraft - A-12 P-38 Petitioners and respondent have respectively conceded the amounts of these expenditures which*108 were income to Grant Foster and attributable to his personal use of the aircraft, and the amounts thereof which were not taxable income to him, as follows: Conceded byConceded byPetitionersRespondentto beas notIncome toTaxableNumberGrant FosterIncomeofattributable toto GrantYearCheckspersonal useFoster19492$ 500.0019501868,677.00195126126,000.2119523628,990.94195318$15,999.93107,889.6019544031,660.5934,310.6619555624,339.09019565828,000.392,221.97 These 254 checks are no longer in issue, and the amounts reflected therein as conceded by petitioners are in addition to petitioners' concessions reflected in the following paragraph. Of the New York account checks determined by Commissioner to be withdrawals by Grant Foster for personal purposes, petitioners have conceded that the following checks and amounts thereof were personal withdrawals by Grant Foster: NumberofYearChecksAmount8/49 to 12/4911$ 23,480.2019501016,617.9919513374,507.25195213219,048.941953941,614.0019541449,355.45195531125,664.1019563535,518.37*109 These personal withdrawals, ranging in amount from $3.30 to $200,000, were spent by Grant Foster for sundry personal purposes, such as personal loans and gifts to his brother-in-law, son, great aunt, former wife, mother-in-law and other relatives; deposits in personal bank accounts; allowance to Foster's wife for personal or household purposes; purchases at department stores; purchases and rental of automobiles; personal and family medical expenses; personal traveling, hotel and entertainment expenses; personal clothing; charitable contributions; costs of building a home in El Cajon, California; costs of schooling for Foster's children; payment of personal income taxes; gifts to female friends; rent payments; cash for Foster; country club initiation fees and dues at a Coral Gables, Florida, country club; personal investments; creation of a personal $200,000 trust; and many other miscellaneous personal purposes. 1Of the New York account checks determined by Commissioner to be withdrawals*110 by Grant Foster for personal purposes, the following remain in controversy: NumberofYearChecksAmount27/49 to 12/494$ 16,500.0019501575,438.12 3195113202,516.41 4195226327,500.04 5195316464,160.88195416200,557.15195532311,697.01 6195642113,394.92*111 Withdrawals deposited in personal bank accounts. Grant and Barbara Dunn Foster opened and maintained various personal checking and savings accounts in the United States during the years 1949 through 1956. Such accounts were maintained at the Whitney National Bank, New Orleans, Louisiana; the Bank of America at both La Jolla and Los Angeles (Wilshire-Sweetzer Branch), California; and at the Florida National Bank & Trust Co., Miami, Florida. During the years 1949 through 1956, Grant Foster withdrew at least $156,500 from the New York account, which he deposited in personal checking and savings accounts, as follows: DateChargedCheck No.by BankAmountWhitney National BankNew OrleansSavings Account110392 (C)8/16/49$10,000.00101476 (C)8/25/525,000.00Bank of America,La Jolla, Calif.Checking Account100770 *10/30/50$11,000.0010127512/ 7/5110,000.00101473 (C) **8/ 4/522,500.00Savings Account110393 ***8/16/49$10,000.00#683410076810/10/5010,000.00100770 *10/30/5010,000.001012289/14/5110,000.00101409 ****3/ 7/5210,000.00Bank of America,Wilshire-Sweetzer BranchChecking Account177777(C)7/13/5310,000.00Florida Nat'l. Bank &Trust Co. - MiamiChecking Account #1101264 *****10/31/51$20,000.00Barbara FosterChecking AccountD178848 (C)9/13/55$ 2,000.00251518 (C)12/11/561,000.00Checking Account #2177770 (C)6/26/53$20,000.00251513 (C)11/28/565,000.00Savings Account#X79161014154/18/52$10,000.00*112 The total of the foregoing deposits for each of the years 1949-1956 is as follows: YearTotal1949$20,000.00195031,000.00195140,000.00195227,500.00195330,000.00195419552,000.0019566,000.00*113 These amounts were diverted by Grant Foster to his personal use. The evidence does not show that the $2,500 portion of check no. 101473, not conceded by petitioners, was used for other than personal purposes by Foster. Mr. and Mrs. Hugh Foster. Hugh Foster and Stella Foster, parents of Grant Foster, resided at 415 Chambers Street, El Cajon, California, during the year 1949 and January 1950. In 1950, Hugh Foster purchased and operated a small dairy ranch located near Modesto, California, where he and his wife lived until 1952. In 1952, a parcel of property located near Mesa, Arizona (hereinafter referred to as the Mesa property), was purchased in the name of Retsof Corporation, and Hugh Foster and his wife then moved onto the Mesa property. 7Petitioners have stipulated that certain gifts were made by Grant Foster to his parents from the New York account in each of the years 1951 through 1956. During the years 1949, 1950 and 1952, additional checks were drawn on this account by Grant Foster, payable to Hugh Foster or his wife, as follows: CheckCheckPayeeNumberDateAmountHugh FosterB1103857-24-49 *$ 1,000.00Mrs. Hugh FosterD6490510-9-49500.00Hugh FosterD649471-24-501,000.00Hugh FosterD649582-10-5010,000.00 **Hugh FosterD649683-25-5010,000.00 **Hugh FosterD1007358-14-5010,000.00 **Mrs. Hugh FosterD1007187-29-50300.00 **Hugh FosterD1007669-29-501,000.00 **Mrs. Hugh FosterD1014345-3-52500.00 **Hugh FosterD1014778-16-521,000.00 ***114 Each of these checks represents a withdrawal of corporate funds for the personal benefit of Grant Foster. Phillip Basser. Phillip Basser and Grant Foster served together in the Army during World War II. After the war, when Foster was in business as a sole proprietor, he and Phillip Basser entered into an agreement that Basser was to buy a tractor and ship it to Foster in Venezuela with the intention that the tractor would be sold and any profit split evenly between them. In 1948, Basser expended approximately $9,000 to buy a used Model D-7 caterpillar tractor and shipped the tractor to Foster in Venezuela. When the tractor arrived in Venezuela, Foster found that it would not operate and expended some of his funds to put it in operating condition. The tractor was not sold. It was used by Foster in his construction business until Foster Construction, C.A. was formed in 1949 and then it was transferred to that corporation and used in its business. The following checks were drawn on the New York account, payable to Phillip Basser: CheckDate ofNo.CheckAmount6491511/1/49$5,000.001777564/16/532,000.00*115 The $5,000 check in 1949 represented a use of corporate funds to pay for the tractor that the corporation took over for business purposes. A letter written by Foster to Basser, transmitting the $2,000 check in 1953, read, in part, as follows: Dear Friend Phil: I had this check in my pocket the other night and forgot to give it to you with all the confusion we had around us. I know you feel I don't owe you any money on our tractor deal Phil and of course I really don't but you lost money on it and so did I but the day has come when I can afford to lose it easier than you so don't give me any trouble about it. * * *The $2,000 check in 1953 represented the discharge of a moral personal obligation of Grant Foster and was a diversion of corporate funds to his personal use. Paul R. Cheesman. Paul R. Cheesman is the brother-in-law of Grant Foster. During the years 1949 through 1953 Foster drew checks on the New York account to Cheesman approximating $16,137.92, which petitioners have conceded are personal to Grant Foster, and one check in 1951 of $863.27 which the respondent has conceded was not personal to Grant Foster. Additional checks drawn on this account to Cheesman, *116 signed by Foster, during this period were as follows: Check No.Date of CheckAmountD10077510/30/50$ 480.84D2512916/4/561,500.00D2514166/24/5625,000.00In the case of the first check, petitioners have conceded that $200 thereof was for a family portrait and personal to Grant Foster. No evidence was introduced to show the purpose of the balance of this check or to establish that it was not used for the benefit of Grant Foster. The $1,500 check given by Foster to Cheesman in 1956 was for expenses of the Grant Foster trust (hereinafter described) after Cheesman became successor trustee, and represented a diversion of corporate funds for the personal benefit of Grant Foster. In the case of the $25,000 check, the minutes of a special meeting of the board of directors of American Industrial Sales Corporation (hereinafter described) held on June 26, 1956, disclose that the following resolution was adopted at that meeting: RESOLVED, that the officers of this corporation be and they hereby are authorized and directed to borrow immediately from Paul R. Cheesman, an individual, the sum of Twenty-five Thousand Dollars ($25,000.00), and as security therefor*117 to execute a promissory note for said sum, payable on demand. The minutes were signed by Harry D. Werkheiser, as Secretary, and by Paul R. Cheesman, as Chairman. The minute book of American Industrial Sales Corp. also contains what appears to be a copy of a note, dated June 26, 1956, wherein the corporation promises to pay to the order of Paul R. Cheesman, on demand, the amount of $25,000. The $25,000 check number D251416 was endorsed by Paul R. Cheesman, and deposited to the account of American Industrial Sales Corp. Cheesman was not acting in his own behalf in this transaction. As hereinafter found, one-third of the stock of American Industrial Sales Corp. was owned by Foster and the other two-thirds by Foster Construction, C.A. The substance of the foregoing transaction was a withdrawal of $25,000 from Foster Construction, C.A., one-third for the personal benefit of Foster and two-thirds for the benefit of Foster Construction, C.A. "Cash" Checks. Grant Foster signed the following checks drawn on the New York account, payable to "cash", during the years 1951 through 1956: Check No.DateAmount10126610/31/51$2,500.001014547/3/522,000.001784451/26/551,000.001784502/7/551,000.002512031/5/56$1,500.002512301/26/56500.002514136/25/561,000.002514217/2/561,000.002514317/9/56500.0025151712/6/561,000.0025153312/18/561,500.00*118 Sixty percent of the amount of each of these checks represents a diversion of corporate funds for the personal benefit of Grant Foster. Fewel & Co. Fewel & Co. was a stock brokerage firm engaged in the securities business in San Diego, California, during the years 1951 through 1957. During this period the following funds were withdrawn by Grant Foster from the New York account for the purchase of securities in three different regulated investment funds - Investment Company of America, Affiliated Fund, Inc., and Fundamental Investors, Inc.: Date ofFor purchase ofCheck No.CheckAmountstock in:D10091812/15/50$ 4,997.90Investment Co. of AmericaD10091112/9/501,876.54Investment Co. of AmericaD1009632/16/515,000.00Investment Co. of AmericaD1012299/11/5119,998.00Affiliated Fund, Inc.D1014103/7/5219,992.96Fundamental Investors, Inc.With respect to the Investment Co. of America stock, the three checks listed above for the purchase of such stock were used to purchase stock as follows: CheckDate ofNo. SharesShares originallyNo.CheckAmountIssuedissued in the name of:D10091812/15/50$4,997.90410Grant FosterD10091112/9/501,876.54548Foster Construction, C.A.D1009632/16/515,000.00*119 With respect to check No. D100911, such check was in the amount of $2,134.45, payable to Hugh L. Ross & Associates, a Hollywood, California insurance agency. Such check was originally issued to pay a premium for aircraft insurance. The insurer, Lloyd's of London, rejected the insurance, however, on January 2, 1951. The unearned premium in the amount of $1,876.54 was refunded by check payable to Grant Foster by the insurance agency, at Grant Foster's request. Foster requested such refund by his letter dated January 14, 1951, and endorsed the refund check to Fewel & Co., as follows: For investment purposes only with the Fewel & Company, San Diego, Calif./s/ Grant Foster On June 19, 1952, the 548 shares of Investment Company of America, which were originally issued in the name of Foster Construction, C.A., were reissued in the form of six certificates in the name of Grant Foster. Thus, as of June 20, 1952, there were 958 shares of stock in Investment Company of America registered in the name of Grant Foster. Aside from a cash dividend in the amount of $213.20 in December, 1950, on the first 410 shares held in the name of Grant Foster (which dividend was deposited by Foster*120 in his bank account at the Bank of America, La Jolla, California), the further dividends issued on the Investment Company of America stock in the name of Grant Foster were reinvested in additional shares of Investment Company of America stock, as follows: SharesSharesPur-Accu-DateAmountchasedmulated9/30/52Balance41.092510/1/52$ 119.899.941151.033612/24/52676.0555.4139106.44754/1/53127.7310.6976117.14517/1/53129.0111.2869128.432010/1/53130.3711.7133140.145312/21/53483.1841.3681181.51342/19/54100% stockdividend181.5134363.02684/1/54136.7421.0369384.06377/1/54138.0019.6022403.665910/1/54139.1718.1921421.858012/21/541,075.41131.1475553.00554/1/55171.4320.0737573.0792On April 5, 1955, the 573.0792 Investment Co. of America shares purchased through reinvested dividends were redeemed at $8.56 per share. In payment of this amount, Fewel & Co. issued its check on April 5, 1955, payable to the order of Grant Foster in the amount of $4,905.55. That check was endorsed by Grant Foster and deposited on April 15, 1955 in the New York account. *121 Both prior to the surrendering of the 548 shares of Investment Co. of America in the name of Foster Construction, C.A. and after the reissuance of those shares in the name of Grant Foster, all the dividends were reinvested in additional shares. The shares purchased through dividend reinvestments were as follows: SharesSharesPur-Accu-DateAmountchasedmulated7/2/51$ 65.765.72325.723210/1/5166.455.290611.013812/24/51380.1332.187143.20094/1/5270.945.916549.11747/1/5271.655.806354.923710/1/526.59.546455.470112/24/5237.163.045958.516012/21/5325.742.203760.71972/19/54100% stockdividend60.7197121.439412/21/5455.866.8121128.2515On December 1, 1955, the reinvestment of dividends on these 548 shares originally purchased in the name of Foster Construction, C.A. was discontinued. The fractional share was liquidated and a certificate for 128 shares of Investment Co. of America, accumulated on these 548 shares, was issued in the name of Foster Construction, C.A. All dividends subsequent to that time were paid in cash. On March 1, 1955 and on March 4, 1955, all 1,916*122 shares of Investment Co. of America stock (the 958 shares increased through a 1954 100 percent stock dividend) held in the name of Grant Foster were sold through Fewel & Co. for a total sales price of $16,969.96. This amount was paid by Fewel & Co. check on March 10, 1955, drawn payable to the order of Grant Foster. Foster endorsed the check as follows: "Deposit acct. SALA, Miami, Florida, Grant Foster." SALA was a Costa Rican corporation the majority of the stock of which is hereinafter found to have been owned by Foster Construction, C.A. With respect to the purchase of the Affiliated Fund, Inc. shares, the following transpired: On September 11, 1951, Foster withdrew $19,998.00 by check dated September 11, 1951, to purchase 3,636 shares of stock in Affiliated Fund, Inc. A certificate for such 3,636 shares was issued on September 14, 1951 in the name of Foster Construction, C.A. On October 29, 1951, a stock dividend of 332 shares was paid by Affiliated Fund, Inc., and a certificate for those shares was issued in the name of Foster Construction, C.A. On June 24, 1952, the two certificates in the name of Foster Construction, C.A., representing 3,968 shares of Affiliated Fund, Inc. *123 were surrendered to the Morgan Guaranty Trust Company, the record and distribution agent for the fund, and there was reissued one certificate for 3,968 shares of Affiliated, which was in the name of Grant Foster. On October 27, 1952, a stock dividend of 100 shares was paid by Affiliated and a certificate for those shares was issued in the name of Grant Foster. During the period when the shares of Affiliated were in the name of Foster Construction, C.A., cash dividends were paid as follows: DateAmount10/10/51$181.801/21/52277.764/21/52238.087/21/52198.40Subsequent to the reissuance of the 3,968 shares of Affiliated to Grant Foster on June 24, 1952, and the stock dividend of 100 shares, and prior to their liquidation, Grant Foster reinvested all of the dividends paid thereon in additional shares of Affiliated as follows: SharesSharesPur-Accu-DateDividendchasedmulated10/20/52$ 198.4027.44627.4461/20/53245.7231.61759.0634/20/53247.6232.45891.5217/20/53207.9740.072131.59310/20/53293.9762.427194.02010/27/53209.9740.380234.4001/20/54258.1448.071282.4714/20/54261.0246.862329.3337/20/54219.8637.392366.72510/20/54266.0844.420411.14512/8/541,298.95240.368651.5131/20/55283.1745.746697.259*124 By letter dated March 15, 1955 to Guaranty Trust Company of New York, Grant Foster requested that his dividend reinvestment account totaling 651.513 shares of Affiliated be closed out and the check for the proceeds thereof be mailed to him at 1409 DuPont Building, Miami, Florida. The 697 shares of Affiliated were liquidated, and by its check dated April 12, 1955, in the amount of $4,179.82, made payable to Grant Foster, the Guaranty Trust Company of New York paid over the proceeds from the liquidation to Grant Foster. That check was endorsed by Foster "Deposit Account of Foster Construction, C.A., Grant Foster." On March 2, 1955, the 4,068 shares of Affiliated Fund, Inc. were sold by Grant Foster through Fewel & Co. for a total amount of $24,283.81. Fewel & Co. paid such amount by its check dated March 9, 1955, payable to Grant Foster. Grant Foster used the $24,283.81 Fewel & Co. check, together with the proceeds of sale (hereinafter mentioned) of the Fundamental Investors, Inc. stock in the amount of $26,130.87 to purchase Curtiss National Bank cashier's check No. 4196 in the amount of $33,000, payable to SALA Aircraft Sales (which check was endorsed "Payable only to AVIANCA*125 in Colombia /s/ Grant Foster"). The balance in the amount of $17,414.68 was used to purchase a cashier's check at the Curtiss National Bank in the amount of $17,414.68, payable to Grant Foster, which check was endorsed "For deposit only to the account Foster Construction, C.A. /s/ Grant Foster." The check was deposited in that account. On March 7, 1952, Foster purchased stock of Fundamental Investors, Inc. with New York account check No. D101410, payable to Fewel & Co. in the amount of $19,992.96. That check was used to purchase 936 shares of Fundamental Investors, Inc., a certificate for which shares was issued on March 20, 1952, in the names of Grant Foster and Barbara D. Foster. On November 22, 1954, Fundamental Investors, Inc. paid a 100 percent stock dividend which increased the original 936 shares to 1,872 shares. Subsequent to the purchase of the Fundamental shares, and prior to their liquidation, Grant Foster and Barbara D. Foster reinvested all of the dividends paid thereon in additional shares as follows: SharesSharesPur-Accu-DateDividendchasedmulated6/17/52$ 187.208.5878.5879/16/52188.918.77817.36512/27/52695.9532.98550.3503/16/53216.999.72560.0756/16/53219.1311.08371.1589/15/53221.5711.61882.77612/28/53$348.4216.72699.5023/15/54227.8110.106109.6086/15/54250.9410.326119.9349/15/54242.869.287129.22111/22/54100%stock split129.221258.44212/15/54255.6518.131276.57312/27/541,001.3077.260353.8333/15/55244.8416.554370.387*126 On April 4, 1955, the 370.387 shares of Fundamental Investors, purchased by reinvestment of dividends, were liquidated at $13.99 per share for a total of $5,181.71. The proceeds were represented by a check drawn on the City Bank Farmers Trust Company on April 4, 1955, payable to the order of Grant Foster and Barbara D. Foster in the amount of $5,181.71. Such check was endorsed by Grant Foster and Barbara D. Foster and was deposited on April 15, 1955, in the New York account. On or about March 1, 1955, the remaining 1,872 shares of Fundamental Investors, Inc. stock were sold by Foster through Fewel & Co. for the amount of $26,130.87. Such amount was paid by Fewel & Co. check to Grant Foster and Barbara D. Foster. As already noted, this check was used by Foster to purchase a cashier's check at the Curtiss National Bank. Under date of March 17, 1953, T. A. Whiteside, Foster's attorney, addressed a letter to Fewel & Co., which read, in part, as follows: From a statement furnished by you to Mr. Grant Foster re income from securities 1952, I note you show dividends of $644.67 and capital gains of $30.51 under Foster Construction Company. It is my understanding that you were to show*127 this investment in the name of Grant Foster, rather than Foster Construction Company. Will you please check your records and advise me accordingly? * * *Again, Foster Construction Company, as shown on your books, should be listed in the name of Grant Foster. The disposition of the proceeds of such sales, in summary, was as follows: DateType of check and amountDisposition of proceeds4/ 5/55Investment Co. of America,Deposit account "FosterConstruction, C.A." atreinvestment of dividends$ 4,905.55Bank of London - New York3/ 1/55Investment Co. of America,shares$16,969.96Deposit to account of SALA4/12/55Affiliated Fund dividend re-Deposit account "FosterConstruction, C.A." -investment$ 4,179.82Bank of London - New York4/12/55Affiliated Fund shares$24,283.81$33,000.00 to SALA Air.Sales4/12/55Fundamental Inv. shares$26,130.87$17,414.68 to acct. "FosterConstr. C.A." at Bank$50,414.68$50,414.68 of London-N. Y.Deposit account "Fos-4/ 4/55Fundamental Inv. dividendter Construction, C.A." atBank ofreinvestment$ 5,181.71London - New York*128 In petitioners' Federal income tax returns for the years 1952 through 1954 they reported the receipt of dividends on stock of Investment Co. of America, Affiliated Fund, and Fundamental Investors, Inc., and in those returns, and their 1955 return, they reported capital gains realized on sales of such stock. The investments in Investment Co. of America, Affiliated Fund, Inc., and Fundamental Investors, Inc. securities in the years 1950, 1951 and 1952, with funds withdrawn from the New York account, were made on behalf, and for the benefit, of Foster Construction, C.A. Carson Airplane Service. The following check, signed by Grant Foster, was drawn on the New York account, payable to Carson Airplane Service: DateDate ofChargedCheck No.Checkby BankAmountD10127612/7/5112/26/51$14,638.45About December 1951, James W. Carson, who resided or was engaged in business in the San Diego, California area, approached Grant Foster and suggested that Foster associate himself in the aircraft parts and repair business with Carson as a partner. An agreement was reached in these respects to the effect that Foster would match Carson's inventory*129 parts with cash. The check listed above was for this purpose. In about November 1952, Foster suggested that the arrangement between the parties be treated as a loan to Carson rather than a partnership. Thereafter, Carson advanced certain services and supplies for benefit of Foster Construction, C.A. leaving a net balance due on the loan on his books in the amount of $13,510.21. The net amount of $13,510.21 was a personal loan. Such amount, therefore, was income to Grant Foster in the year 1951. The debt resulting from the loan became worthless in the year 1956 to the extent of $13,510.21, and Grant Foster sustained a bad debt loss in that amount in 1956. T. A. Whiteside. T. A. Whiteside (hereinafter referred to as Whiteside(, who died in the year 1961, was an attorney engaged in the general practice of law in Miami, Florida, during the taxable years involved, either as a member of the partnership, Yonge and Whiteside, or as a member of the partnership, Yonge, Whiteside and Prunty. Other associates and employees were also employed by these law firms. Whiteside was enrolled as a registered practitioner before the Internal Revenue Service from 1950 to 1961. In the year 1950, Grant*130 Foster was introduced to Whiteside, and retained Whiteside as his attorney in the United States. Whiteside continued to represent Foster until May 25, 1956, when their attorney-client relationship was terminated. During this period he also represented Foster Construction, C.A. in some transactions. During the years 1950 through 1956, substantial sums were withdrawn by check from the New York account by Foster and sent to Whiteside for investment, trust and other purposes. Miscellaneous Items and Income Tax. In 1951 and 1953, the following checks, signed by Grant Foster, payable to the order of T. A. Whiteside, were drawn on the New York account: Check No.Date of CheckAmount1009953/22/51$2,000.001012159/20/51218.4117779611/3/533,798.64 Check number 100995 in the amount of $2,000 shows on its face that it was used to purchase a cashier's check at the Florida National Bank & Trust Co., Miami, Florida, and petitioners have conceded on brief that it was personal. With respect to check number 101215 in the amount of $218.41, this check was for reimbursement of costs, the nature of which Foster could not explain. About November 3, 1953, after the*131 filing of Foster's income tax returns for the years 1947 through 1950 and 1952 by Whiteside and after the termination of divorce proceedings brought against Foster by his wife, Foster sent the $3,798.64 check to Whiteside for reimbursement of costs incurred by Whiteside. These checks represent withdrawals of corporate funds for Foster's benefit. The Springs Restaurant, "Tambor". A restaurant known as "The Springs Restaurant" was operated at Miami Springs, Florida, near Miami. In the fall of 1951, Grant Foster, on several occasions, visited The Springs Restaurant to look over the premises and to determine whether the purchase of such restaurant would be a good investment. Thereafter, together with Whiteside, he negotiated with one of the owners, Isadore Glick, for the purchase of the restaurant, and an agreement was reached for the sale of the restaurant to Foster. On November 1, 1951, Foster, as purchaser, and Glick, as seller, entered into a contract for the purchase by Foster of the Springs Restaurant business, including the land, improvements, furnishings, licenses, and equipment, for the purchase price of approximately $105,000, plus $9,089.21 in other credits to the seller. *132 In connection with the purchase of the Springs Restaurant, checks were drawn by Grant Foster on the New York account as follows: CheckDate ofNo.CheckPayeeAmount10126911/1/51Dade Commonwealth Title Co.$ 10,500.0010127011/1/51T. A. Whiteside114,500.00$125,000.00 The $10,500 check represented the escrow deposit which was made by Whiteside on November 1, 1951 to the escrow agent, Dade Commonwealth Title Company. The $114,500 check was deposited by Whiteside in his trust account at the Florida Bank. On November 2, 1951, Grant Foster assigned the contract to purchase the Springs Restaurant to "T. A. Whiteside, Trustee". On November 6, 1951, a Florida corporation known as "Tambor, Inc." was formed, with a capitalization of 50 shares of authorized stock. Whiteside, a law associate, and an employee in his law office subscribed to the first five qualifying shares of stock, and were named as the first officers and members of the Board of Directors of Tambor, Inc. With respect to the additional 45 shares of stock, such shares were issued under date of November 10, 1951, to Grant Foster, who signed acknowledgment of receipt thereof under*133 date of March 15, 1952. The only Federal income tax return filed by Tambor, Inc. was for the period November 8, 1951 to October 22, 1952. On that return it was reported that Grant Foster owned 95 percent of the stock of Tambor, Inc., that he acquired such stock in November, 1951; and that the principal business activity of the corporation was the operation of a "Bar, Package Store and Restaurant". The return was prepared by a certified public accountant and signed by Whiteside as president. The purchase of the Springs Restaurant was closed on November 15, 1951, when the real and personal properties and the restaurant business were conveyed by the sellers to the newly formed Florida corporation, Tambor, Inc. With respect to the $125,000 withdrawn from the New York account by Foster in November 1951, in connection with the purchase of the Springs Restaurant, the following amounts were paid out for the purchase of the business: DateAmountPurpose11/1/51$ 10,500.00Option deposit (from Foster)11/15/51102,031.25To Escrow agent (from Whiteside trust account)11/15/511,760.30To Escrow agent (from Whiteside trust account)$114,291.55The law office*134 records of T. A. Whiteside disclose further expenditures from that office in connection with the incorporation of Tambor, Inc., and advances to Tambor, Inc., charged on a ledger sheet maintained in Whiteside's office, entitled "Grant Foster - The Springs". The two foregoing checks dated November 1, 1951, in the aggregate amount of $125,000 represent withdrawals by Foster from the New York account for his own benefit. On November 20, 1951, Tambor, Inc. executed a promissory note in the amount of $90,000, payable to Grant Foster in annual installments of $9,000, plus five percent interest. Such note was secured by a mortgage on the properties of Tambor, Inc., also to Grant Foster. The Springs Restaurant was operated during the years 1951 and 1952. During its operation, Grant Foster drew the following additional checks on the New York account payable to Tambor, Inc.: CheckDate ofAmountNo.Check10128112/14/51$2,000.0010128212/17/51300.001012911/ 7/521,000.001014042/20/521,500.001014597/ 5/521,180.42 These checks represent withdrawals by Foster from the New York account for his own benefit. In the fall of 1952, the restaurant*135 business was sold by Grant Foster. In connection with the sale, the following transpired: (a) Under date of October 1, 1952, Tambor, Inc., by warranty deed, transferred the properties of the corporation to Whiteside, Trustee, and Foster assigned his stock in Tambor, Inc. to T. A. Whiteside, Trustee. (b) Whiteside, as trustee for one C. A. Jordan, drew a check dated October 1, 1952, in the amount of $29,654.30, payable to the order of Grant Foster. Foster personally deposited such check in his personal savings account (number X7916) at the Florida Bank on November 5, 1952, and made the following notation on the deposit slip which accompanied that deposit: "Payment stock Tambor, Inc." (c) Under date of October 1, 1952, Grant Foster gave Tambor, Inc. a satisfaction of the November 20, 1951 $90,000 mortgage. Although the satisfaction of mortgage was dated October 1, 1952, it was not filed for record in the Public Records of Dade County, Florida, until November 13, 1952. (d) On October 21, 1952, the stockholders of Tambor, Inc. filed a certificate for dissolution of such corporation with the Secretary of State for the State of Florida, and the corporation was officially dissolved*136 on October 27, 1952. (e) On October 28, 1952, the Springs business properties were transferred by T. A. Whiteside, Trustee, to the purchaser, the Springs Restaurant, Inc., a Florida corporation. (f) As shown by the seller's closing statement, the seller, T. A. Whiteside, Trustee, received the following on the October 28, 1952, sale: Deposit$ 10,000.00Chattel mortgage to T. A. Whiteside, Trustee7,500.26Mortgage to T. A. Whiteside, Trustee79,999.74Pro-ration of real estate taxes1,388.08Adjustment200.00Balance at closing58,777.46$157,865.54The two promissory notes, secured by mortgages, received by Whiteside, as Trustee, on the closing of the transaction were payable in the following terms, at five percent interest per annum: (a) $79,999.74 NotePaymentDateAmount(1)10/27/53$ 8,889.53(2)10/27/5417,777.51(3)10/27/5517,777.51(4)10/27/56$17,777.51(5)10/27/5717,777.68$79,999.74(b) Chattel mortgagenote 10/28/52$ 7,500.26The $79,999.74 mortgage of October 28, 1952, and the chattel mortgage note were thereafter assigned by Whiteside Trustee, to Grant Foster about*137 December 5, 1952. Thereafter, Foster reassigned the $79,999.74 mortgage to Whiteside as Trustee, on March 12, 1953. Whiteside made collections on this mortgage of $68,038.66 between 1953 and May 1956. These collections were taken into account on the final settlement between Foster and Whiteside. The interest income on the mortgage was accounted for as income of the Grant Foster trust. In March of 1952, Grant Foster met a Mrs. Elizabeth Thomlinson at Los Angeles, California, on a visit to that city. At that time, in connection with prospective business ventures, Grant Foster told Mrs. Thomlinson that he owned a bar and restaurant in Miami. In the spring of 1955, Foster, Paul Cheesman and Loyd Hardesty had lunch at the Springs Restaurant at Miami, Florida. At that time, Foster told Hardesty that he had once owned the Springs Restaurant. Charles E. Thompson Checks. Charles E. Thompson, a friend of Grant Foster, managed the Springs Restaurant. When the business was begun, Foster advised Thompson that when the initial investment in the restaurant was recovered that Thompson would be made an equal partner in the business. However, since the restaurant was not profitable and was sold*138 by Foster, Foster felt under a moral obligation to give money to Thompson. For this reason, Foster gave Thompson $8,000 in the year 1952, which he withdrew from the New York account. The following checks drawn on that account were used for this purpose: CheckDate ofNo.CheckAmount17770411/25/52$6,000.0017772012/24/522,000.00 These two checks represented the withdrawal of corporate funds by Foster for personal purposes. John Stadnik Loan. John Stadnik, a personal friend of Foster, was the proprietor of a drug store located near the Springs Restaurant, in Miami Springs, Florida. In February of 1952, Stadnik told Foster that he needed to borrow some money and asked Foster if he could lend him $25,000. Foster told him that such a loan could be arranged and that he should go to Whiteside's office to arrange the details of the loan. On February 20, 1952, Foster drew check No. D101405 on the New York account in the amount of $25,000 payable to T. A. Whiteside. This check was deposited in the Whiteside trust account on February 21, 1952. A check dated February 29, 1952, in the amount of $25,000 was drawn on the Whiteside trust account, payable to John*139 Stadnik and his wife, Frances Stadnik. Whiteside signed the check and delivered it to the payees, who executed four promissory notes, each in the amount of $6,250, for a total of $25,000, plus interest at the rate of five percent per annum, payable to Tambor, Inc. John Stadnik issued five checks in repay-payment of this $25,000, including interest, as follows: DateAmountPayee2/27/53$7,500.00T. A. Whiteside, Trustee3/1/547,186.50Tambor, Acct. and for T. A. Whiteside3/5/556,925.00T. A. Whiteside11/1/566,250.00Grant Foster11/1/56390.00Grant Foster The November 1956 repayments were endorsed to Retsof of Miami, Inc.Whiteside acknowledged receipt of the first three repayments. At the time the final repayments of principal and interest in 1956 were made to Foster, Foster executed a receipt to Stadnik which provided as follows: I, GRANT FOSTER, DO HEREBY ACKNOWLEDGE RECEIPT OF THE LAST PAYMENT IN THE AMOUNT OF $6,250.00, PLUS INTEREST DUE ME ON MY TOTAL LOAN OF $25,000.00 TO JOHN AND FRANCES STADNIK. ALL PRINCIPAL AND ALL INTEREST DUE HAS NOW BEEN PAID IN FULL ON THE TOTAL LOAN. /s/ GRANT FOSTER OCTOBER 31, 1956 MIAMI SPRINGS, *140 FLORIDAThe $25,000 check drawn upon the New York account represented a withdrawal of corporate funds for the personal benefit of Grant Foster. The interest received on the Stadnik loan amounted to $1,250 in 1953; $936.50 in 1954, $675 in 1955 and $390 in 1956. Interest received on this loan in the years 1953, 1954 and 1956 was not included in the income reported in returns filed by petitioners for those years. In the income tax returns of petitioners for the year 1955, filed on October 14, 1957, interest on the Stadnik loan in the amount of $625 was reported. The interest received on that loan for the years 1953, 1954 and 1955 was reflected on the books of the Grant Foster Trust as income of the trust. In the fiduciary income tax returns filed by Whiteside, as trustee of the trust, for the years ended February 28, 1954, February 28, 1955, and February 29, 1956, the following interest income, without identification as to source, was reported: Year endedInterestFeb. 28, 1954$ 8,401.68Feb. 28, 195510,648.23Feb. 29, 19566,718.77Political Contribution. On April 23, 1952, check no. 101424 in the amount of $35,000, payable to Whiteside, was drawn by*141 Foster on the New York account. This check was issued to Whiteside for use as a Florida political campaign contribution. In Foster's final settlement with Whiteside in May, 1956, the $35,000, as hereinafter noted, was treated as an amount paid to Whiteside for "attorneys' fees", although no such fees were owed to Whiteside at that time. This check represented a withdrawal of corporate funds for Foster's personal benefit. The Grant Foster Trust. Grant Foster drew the following check on the New York account, payable to T. A. Whiteside: Check No.Date of CheckAmount101496 (C)11/6/52$200,000.00 These funds were transferred to a trust created by Foster on November 18, 1952 (referred to as the Grant Foster trust). T. A. Whiteside was designated by Foster as the trustee under the Grant Foster trust of November 18, 1952. The trust agreement provided in part as follows: THIS TRUST AGREEMENT, made this 18th day of November A.D. 1952, witnesseth that I, the undersigned, GRANT FOSTER * * * hereinafter referred to as the Grantor, desiring to relieve myself of part of the care and responsibilities of management of part of my estate, and to provide for the future*142 financial needs and support of my wife and the maintenance and education of my children, hereinafter named, have this day assigned, transferred and delivered, without consideration and solely because of my love and affection for my said wife and children, the property hereinafter described to T. A. WHITESIDE, TRUSTEE, hereinafter referred to as my trustee, To Have and To Hold the same unto himself, and his successors and assigns IRREVOCABLY IN TRUST NEVERTHELESS for a period of not less than eleven (11) years, or for a longer period as hereinafter set forth * * *. Among other things, the trust agreement provided that the trustee might purchase assets of the grantor's estate; that the grantor, Grant Foster, during his lifetime, on resignation of the trustee, might appoint a successor trustee; and that the grantor, Grant Foster, during his lifetime, might remove the trustee, or any successor trustee. Whiteside, as trustee, made numerous investments in leaseholds, mortgages, and other assets in the Miami, Florida, area. For the fiscal years of this trust ended February 28, 1954 through February 28, 1956, income tax returns were filed for the trust reporting interest, dividends, and*143 long term capital gains on the sales of property purchased and sold in the name of the Grant Foster trust. In the spring of 1956, a dispute arose between Whiteside and Foster, and it was concluded between Foster and Whiteside that Whiteside would no longer serve as trustee. Under date of April 2, 1956, Whiteside addressed a letter to Foster rendering an accounting with respect to income and principal of the Grant Foster trust. Such letter provided in part, as follows: For several months you have been advised that it is my desire to terminate my responsibility as trustee and although you have been requested upon several occasions to name a successor trustee, you have not done so, as yet. Upon your naming such successor trustee, in writing, I shall prepare, execute and deliver all necessary papers for delivery of the corpus of such trust to the named successor trustee and the balance required by the statement of accounting. Grant Foster thereupon addressed a letter to his brother-in-law, Paul Cheesman, under date of May 1, 1956, which read as follows: Pursuant to our conversation, I am now requesting you to represent my interest by becoming trustee for certain investments and*144 funds now held by T. A. Whiteside as trustee. Acceptance of this appointment will confirm our agreement and will be finalized with an agreement between T. A. Whiteside, trustee, and you, as successor. Cheesman and Whiteside, as successor trustee and as trustee respectively of the Grant Foster trust, executed an agreement dated May 25, 1956, providing for an accounting of the properties and income of the Grant Foster trust during Whiteside's trusteeship, and for a delivery of the trust assets from Whiteside to Cheesman. In that agreement, it was provided that the value of the trust assets as of May 25, 1956 was $248,338.12, including net income from the investment of trust funds amounting to $48,338.12. Distribution thereof to Cheesman, as successor trustee, was a follows: Trust assets, at agreed valuation, includingmortgagesand stock (to be delivered to Cheesman)$131,987.33Dania Beach Hotel leasehold (to be retained by T. A.Whiteside, trustee, until consumation of sale forpriceof $31,887.49) Amount of trust funds invested27,887.49$159,874.82Cash to be delivered to Paul Cheesman, successor64,831.65trusteeLegal fees to T. A. Whiteside23,631.65TOTAL$248,338.12*145 On May 25, 1956, Whiteside drew checks in the amounts of $64,831.65 and $3,260.46, payable to Paul R. Cheesman, Successor Trustee, on the T. A. Whiteside Trust Account at the Florida National Bank & Trust Co. The endorsements on the back of each of these checks were as follows: /s/ Paul R. Cheesman, Successor Trustee For deposit only in the Bank of London & South America Ltd.N. Y.Account of Foster Construction, C.A. /s/ Grant Foster These advances were made by the trust to Foster Construction, C.A. as "loans", at Grant Foster's request. Also, under date of May 25, 1956, Grant Foster signed a general release to T. A. Whiteside, trustee, which provided in part that Grant Foster, as grantor under the Grant Foster trust of November 18, 1952, had completely released and discharged T. A. Whiteside, trustee, from any conceivable claim which could arise against Whiteside in respect of his trusteeship. Thereafter, Paul Cheesman, as trustee, at the request of Grant Foster, transferred the other funds and proceeds from the disposition of other assets of the Grant Foster trust to Foster Construction, C.A. as "loans" for investment in enterprises of Foster Construction, C.A. in*146 areas outside the United States. The only "assets" of the Grant Foster trust in October 1964 were "loans" by the trust to Foster Construction, C.A. (and/or Foster Construction, S.A., hereinafter described), and the only income of the trust was interest on these loans. Retsof of Miami, Inc. On March 19, 1952, "Retsof of Miami, Inc.", hereinafter referred to as "Retsof" (Foster spelled backwards), was incorporated under the laws of the State of Florida. Its certificate of incorporation provided for a maximum of 100 shares of outstanding stock. Whiteside and two other attorneys in his office filed the certificate of incorporation, subscribed to the corporation's first five qualifying shares of stock, and became members of its board of directors. Whiteside was appointed president of the corporation and one of those attorneys, H. Earl Barber, secretary. Retsof was created in an attempt to avoid placing Grant Foster in the position of being a resident of the United States. In June of 1952, the five qualifying shares held by Whiteside and his associates were surrendered, and the entire 100 authorized shares of capital stock of Retsof were issued to Grant Foster. Such shares remained*147 of record in the name of Grant Foster throughout the years 1952 through 1957. The stock book of Retsof shows the assignment and transfer of Foster's shares to Paul Cheesman, Trustee, on June 10, 1957. Although title to certain properties, hereinafter more fully described, was taken in the name of Retsof, at no time during the years 1952 through 1960 did Retsof carry on any business activity. A bank account was opened for Retsof on April 23, 1952, at the Florida National Bank and Trust Co., Miami, Florida. Whiteside and Barber were the only persons authorized to draw checks on this account until April 1955 when Paul Cheesman became the only authorized drawer. Another account was opened about July 1956 for Retsof at the Hialeah-Miami Springs Bank, upon which Cheesman was the authorized drawer. In Whiteside's office, two ledger sheets were maintained, entitled "Retsof of Miami, Inc." and "T. A. Whiteside, Trustee - Retsof of Miami, Inc." Entries reflecting the transactions involving Retsof handled through Whiteside's office were made in such ledger sheets. When Whiteside and Foster severed relations in May, 1956, Paul Cheesman was appointed president of Retsof. Sometime after the*148 end of 1956, Cheesman retained an accountant to prepare reconstructed books and records for Retsof from its check books, correspondence and asset folders, and from other sources, and to prepare and file income tax returns for Retsof for years subsequent to its incorporation. The first reconstructed set of books and records of Retsof prepared by the accountant was lost after the income tax investigation was in progress. A second reconstructed set of books and records was prepared for Retsof by the same accountant. On its first Federal income tax return, filed on June 17, 1957, in response to the question as to the business activity of Retsof, the answer given was "none". On each of the Federal income tax returns filed for Retsof in July, 1958, for the years 1952 through 1956, the question as to the principal business activity of Retsof was left unanswered. On its Federal income tax returns, Retsof listed the following assets as of December 31 of each of the following years: Asset19521953195419551956Mesa, Ariz.$100,079.89$100,079.89$100,079.89$100,079.89$100,079.89propertyCapital stock ofCoral GablesFirstNat'l Bank46,000.00Hibiscus Island50,803.8154,824.2354,824.2354,824.23propertyBoat - Mi Latina17,180.0017,180.0017,180.0017,180.001953 Nash Healey3,900.003,900.00San Diego11,000.0011,000.0011,000.00propertyCash682.941,507.04308.64587.402,596.60Organizational601.67601.67601.67601.67601.67expenseLoan1,407.522,000.00TOTALS$101,364.50$217,579.93$187,894.43$188,173.19$188,282.39*149 For the years 1952 through 1956, Retsof reported income and expenses as follows on its Federal income tax returns: Income19521953195419551956Rents (Mesa property)$900.00$1,200.00$1,200.00$1,200.00$1,200.00Dividends (Coral Gabies1,000.00Bank Stock)Total Income$900.00$1,200.00$2,200.00$1,200.00$1,200.00Expenses & DeductionsTaxes - Mesa property$572.14$ 15.18$ 219.53Capital stock tax10.0010.0010.0010.00Taxes - Hibiscus property759.79860.34967.63970.13Tax - Boat Mi Latina491.30528.19280.05Tax - San Diego property318.38Bank charges2.652.884.009.00Intangible property tax27.7747.52Miscellaneous54.65Carryback342.59381.88Dividends Rec. deduction425.68Total Expenses and$574.79$1,115.26$2,506.76$1,542.59$1,581.88deductionsNet Income$325.21$ 84.74($ 306.76)($ 342.59)($ 381.88The properties listed in the income tax returns of Retsof, title to which were in the name of Retsof, were acquired under the following circumstances: The Mesa property - Retsof. In the early part of 1952, Hugh Foster, *150 Grant Foster's father, was living on his dairy ranch located near Modesto, California. He then became interested in moving to the Phoenix, Arizona, area, and so advised John Ballantyne, a real estate salesman. At that time Ballantyne had a listing for a 40-acre parcel of property located near Mesa, Arizona, consisting of a large house, a motel, grocery store, service station, and a 30-acre ranch - referred to in the aggregate as the Mesa property. Ballantyne asked Hugh Foster whether he would be interested in acquiring the Mesa property. Thereafter, Hugh and Grant Foster inspected the Mesa property, and Grant Foster decided to purchase it. The seller was then asking $150,000 for the property, but finally agreed to sell it for approximately $100,000. Ballantyne and one Lockwood, a partner in the real estate concern holding the listing for the property, thereupon, at Grant Foster's invitation, visted Grant Foster in El Cajon, California, and received a Bank of America (La Jolla, California) cashier's check in the amount of $10,000 from Grant Foster as a deposit on the Mesa property in March, 1952. By warranty deed dated March 6, 1952, acknowledged before a notary public on March 31, 1952, and*151 recorded on April 4, 1952, the sellers conveyed the Mesa property to Retsof. In connection with the purchase of the Mesa property, Grant Foster made the following withdrawals from the New York account: CheckDate ofNo.CheckPayeeAmountExplanation1014093/ 4/52Bank of America$ 20,000.00$10,000.00only to J.Ballantyneas deposit1014123/15/52T. A. WhitesideDepositedtoWhiteside's "Yonge &White-1014133/18/52T. A. Whitesideside TrustAccount"$112,550.00Less one-half check no. 10140910,000.00TOTAL$102,550.00 These withdrawals to the extent of $102,550 were made for the purpose of purchasing the Mesa property for the personal benefit of Grant Foster. The remaining $10,000 reflected in check no. 101409 was deposited in a personal savings account of Grant Foster, and, as heretofore found, represented a diversion of corporate funds for his own benefit. The total cost of the Mesa property was $102,299.36, computed as follows: Escrow deposit to Ballantyne$ 10,000.00Whiteside disbursements in acquisition of the Mesa property: Balance of purchase price90,391.00Fire insurance1,217.70Proration for alfalfa lease550.00General comprehensive insurance140.66$102,299.36*152 The funds remaining out of the $92,550 received by Whiteside from Foster, amounting to $250.64, were deposited in the Retsof bank account. A non-interest bearing note, dated June 1, 1952, in the amount of $92,299.36 payable to Foster Construction, C.A. on demand, was signed by Whiteside as president of Retsof. This note was retained by Whiteside and was not "turned over" to Foster Construction, C.A. In March 1952, Hugh Foster and his wife moved from Modesto, California, to the Mesa property. In 1953 Hugh Foster decided to borrow $27,000 to start a dairy farm near the Mesa property. In 1953, Grant Foster drew the following checks, payable to Hugh Foster, on the New York account: CheckDate ofDate ChargedNumberCheckby BankAmountD1777493-20-533-30-53$ 2,000.00D1777584-27-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,000.00 These checks were deposited in Hugh Foster's personal bank account and were used to purchase the dairy farm. A "Promisory Note", reading, in part, as follows, was signed by Hugh Foster and Grant Foster: Mesa, Arizona, April 27, 1953 PROMISSORY NOTE I Hugh Foster accept from Grant Foster, President of Foster Construction, C.A. of Venezuela the*153 loan of $27,000.00 * * * under the following terms: Maximum loan period to be 6 months from this date, during which time any part or all of the totla (total) sum may be paid without interest. In the event the loan is not paid within the 6 months period 6% per annem (annum) simple interest will be charged * * *As collateral for this loan I Hugh Foster agree to put up the 20 acre dairy farm owned by me in Modesto, Calif./s/ Grant Foster, Grant Foster, President, Foster Construction, C.A. /s/ Hugh Foster, Hugh Foster, Rt. 2, Box 169 1/2, Mesa, ArizonaAbove note paid by check No. 174 dated July 17, 1953 and drawn on the Valley National Bank, Mesa, Arizona, for the sum of ($27,000.00) * * * received at the office of Foster Construction, C.A. July 31, 1953. Interest charges as per agreement waivered. (weavered). /s/ Grant Foster, Grant Foster, President The $27,000 check given by Hugh Foster in payment of the note was deposited by Grant Foster in his personal checking account at the Florida Bank about July 31, 1953. Grant Foster made the following endorsement on such check: For Deposit Only to my Account in Florida National Bank, - Miami, /s/ Grant Foster, Pres., *154 For Foster Construction, C.A. No rentals were paid by Hugh Foster to his son or to Retsof for the use of the Mesa property during the period 1952 through 1956. During the year 1957 an accountant was retained to reconstruct books and records of Retsof and to prepare income tax returns for that corporation. After consultation with Grant Foster's attorney, it was decided that rental income of $1,200 per year from this property would be shown in the books and records of Retsof and in its income tax returns as an amount attributable to the use of the property by Grant Foster's parents. The $27,000 withdrawn from the New York account in 1953 represented funds of Foster Construction, C.A. diverted to the personal use of Grant Foster. The Mesa property was sold, in December of 1957, for $132,500 represented by three mortgages as follows: Assignment of mortgagefrom purchaser-value$ 50,000.00First mortgage57,500.00Second mortgage25,000.00$132,500.00The first mortgage was sold at a discount for $51,500. However, after a dispute between Retsof and the purchaser, and ensuing litigation, Retsof repossessed the Mesa property. About February 25, 1960, the*155 Mesa property was again sold for $100,000. About March 4, 1960, the net proceeds of this sale, $94,379.28, were deposited in the Retsof bank account at the Hialeah-Miami Springs Bank, and such amount (less $4.54 bank clearing charges) was withdrawn by check by Paul Cheesman, president of Retsof, on March 7, 1960, and deposited in the account "Foster Construction, C.A." at the same bank. Hibiscus property. In the latter part of 1952 Grant Foster decided to move his family to Miami, Florida, with the intention of renting living quarters until he was able to purchase a house. In the spring of 1953, a two-story residence on the waterfront, with an attached garage, located at 250 Hibiscus Drive, Hibiscus Island, Miami Beach, Florida, and the furniture and furnishings then in the house were purchased for $39,000. At the suggestion of Whiteside, the purchase was made in the name of Retsof. On May 15, 1953, check number 177763 in the amount of $39,000, payable to Whiteside, was drawn by Grant Foster on the New York account of Foster Construction, C.A. Whiteside deposited this check in the "T.A. Whiteside Trust Account" at the Florida Bank, and drew the following checks, payable to the Dade*156 Commonwealth Insurance Company, to purchase the Hibiscus Island property: DateAmountPurpose5/29/53$ 3,900.00Deposit on purchase6/16/5335,100.00Balance of purchaseprice Entries were made on the ledger sheet entitled "T. A. Whiteside, Trustee - Retsof of Miami" reflecting these disbursements. A non-interest bearing note, dated May 20, 1953, in the amount of $39,000, payable to Foster Construction, C.A. on demand, was signed by Whiteside as president of Retsof. This note was retained by Whiteside and was not "turned over" to Foster Construction, C.A. On June 12, 1953, the sellers of the Hibiscus property conveyed such property, together with furnishings and fixtures, to Retsof. The house was thereafter renovated and remodeled, and also, in June 1953, Grant Foster consulted an interior decorator in Miami with reference to the decoration and furnishing of the Hibiscus house. During the years 1953 and 1954 the following purchases of furniture and household furnishings were made from House & Garden Furniture, Inc., Miami, Florida: AmountDateInvoice sent to$3,232.146-19-53Grant Foster1,255.506-23-53Grant Foster1,931.571- 2-54Grant Foster133.391- 4-54Grant Foster56.001-15-54Grant Foster403.924-28-54Grant Foster*157 Payments in respect of purchases from House & Garden Furniture, Inc. were made as follows: Date ofAccountCheck No.CheckAmount"Foster Construction, C.A." at Bankof London-New YorkD1777696-22-53$1,500.00T. A. Whiteside Trust Account, chargedto Retsof9-25-531,498.15T. A. Whiteside Account, chargedto Retsof10-26-531,498.16Retsof Account at Florida National Bank3-12-542,620.01Retsof Account at Florida National Bank7- 8-54456.45Shortly after the Hibiscus house was purchased Foster and his wife experienced marital difficulties and his wife and family did not live in the house during 1953. In September 1953 Foster employed a houseboy who acted as chauffeur and did the cooking, house cleaning and purchasing of groceries until his employment was terminated in January 1954. Foster did not reside in that house, but during that period he stayed there when he was in Miami and entertained various business associates and friends, some of whom were house guests for one or more days. When he was away, some business associates and friends also stayed at the house from time to time during that period and up to April 1954*158 when Foster's wife and children moved into the house. They lived in the house from that time until "mid-1956", except when his wife was away for short periods on trips. During this period, when Foster was in Miami, he stayed at the house. The $39,000 withdrawn by Foster from the New York account on May 15, 1953, and the $1,500 withdrawn by him on June 22, 1953, were diverted to his personal use. The Hibiscus property and furnishings were listed for sale at $85,000 about October 5, 1956, and at the reduced figure of $65,000 in October of 1957. This property was sold on March 31, 1960, for $40,000. The net proceeds of the sale, $37,240.86, were paid to Retsof and were deposited in the account "Foster Construction, C.A." at the Hialeah-Miami Springs Bank. Coral Gables National Bank Stock. In May 1953, after discussing the acquisition of some Coral Gables National Bank stock with Whiteside, Foster, on May 8, 1953, drew check number 177759, in the amount of $50,000, payable to Whiteside, on the New York account. This check was deposited by Whiteside in the account entitled "T. A. Whiteside Trust Account" at the Florida National Bank and Trust Company at Miami, and the receipt of this*159 check on May 11, 1953, was reflected in the "T. A. Whiteside - Trustee - Retsof of Miami" account. A non-interest bearing note dated May 11, 1953, in the amount of $50,000, payable to Foster Construction, C.A. on demand, was signed by Whiteside as President of Retsof. This note was retained by Whiteside and was not "turned over" to Foster Construction, C.A. On May 14, 1953, T. A. Whiteside disbursed $46,000 from his "T. A. Whiteside Trust Account" at the Florida Bank for the purchase of capital stock in the Coral Gables First National Bank, Coral Gables, Florida. Such stock was taken in the name of "T. A. Whiteside, Trustee". An entry in respect of such purchase was made on the ledger sheet entitled "T. A. Whiteside, Trustee, Retsof of Miami." During the year 1954, dividends were paid on such stock to "T. A. Whiteside, Trustee", in the amount of $500 on January 4, 1954, and $500 on April 2, 1954. Whiteside deposited these dividend checks in his trust account at the Florida Bank, and then issued checks in the same amounts on that account payable to Retsof, and deposited those checks in the bank account of Retsof in the Florida Bank. Retsof reported this dividend income in its*160 Federal income tax return for the year 1954 (filed in 1958), and listed the Coral Gables stock on that return and in its books and records as an asset as of December 31, 1953. In Schedule J of its 1954 return a sale of the Coral Gables stock during 1954 "at no gain or loss" was reported, and on Retsof's books for that year the following journal entry was made to reflect such a sale: 12-31Notes payable - Foster Construction, C.A.$46,000Stock - Coral Gables First National Bank46,000To record sale of stock during year. Funds apparently wereturned over to Foster Construction Co. The New York account does not show any deposit of $46,000 during the year 1954, and no such deposit has been shown to have been made in any other account of Foster Construction, C.A. during that year. The foregoing withdrawal of $50,000 from the New York account by Foster was made for his personal benefit. The "Mi Latina". On July 30, 1953, Grant Foster drew check number D177780 on the New York account in the amount of $15,000, payable to Whiteside. A non-interest bearing note, dated July 30, 1953, in the amount of $15,000, payable to Foster Construction, C.A. on demand, *161 was signed by Whiteside, as president of Retsof. It was retained by Whiteside and not "turned over" to Foster Construction, C.A. About September 10, 1953, Whiteside purchased for $17,180 a 35-foot Chris-Craft motor boat, using the $15,000 check in part payment therefor. An entry reflecting this purchase was made on the ledger sheet "T. A. Whiteside, Trustee - Retsof of Miami". The boat was named the "Mi Latina" and title thereto was taken in the name of Retsof. It was berthed at boat yards in the Miami area and, at times, was docked at the Hibiscus property. The expenses of operating and maintaining the "Mi Latina" were paid from the New York account and from the Retsof bank account at the Florida Bank. The "Mi Latina" was used by Foster for fishing and entertainment purposes in the Miami area from the time of its acquisition in 1953 until about March 28, 1957. At times some of his business associates and friends were entertained on the boat. The foregoing $15,000 withdrawal from the New York account was made for the personal benefit of Grant Foster. On June 20, 1956, Foster Construction, S.A., a Costa Rica corporation, and Williams Brothers Company, a Nevada corporation, formed*162 a joint venture, named Foster-Williams Brothers, to engage in road construction projects for the U.S. Bureau of Public Roads in Costa Rica. About March 28, 1957, after Grant Foster became active on those projects, Retsof sold the "Mi Latina" to Foster-Williams Brothers for $14,200 and a check in that amount dated April 9, 1957, payable to Retsof, signed by Grant Foster, was drawn on the account "Foster-Williams Brothers" at the Hialeah-Miami Springs Bank, Hialeah, Florida. This check was endorsed: Retsoff [Retsof] of Miami, Inc. per /s/ Paul R. Cheesman, Pres. FOR DEPOSIT ONLY TO THE ACCOUNT OF Foster Construction, C.A. and deposited on April 11, 1957, in the New York account. On or about March 28, 1957, the "Mi Latina" was moved from Miami to Costa Rica. Nash-Healey automobile. In February 1954, Grant Foster purchased for $3,900 a 1953 Nash-Healey sports car. A check in payment therefor was drawn on his checking account at the Florida National Bank. Title to the automobile was taken in the name of Retsof and it was listed as an asset of Retsof in its books and income tax returns. It was garaged at the Hibiscus Island property. It was used by several employees of corporations*163 controlled by Grant Foster and by Grant Foster himself when he was in Miami. On October 8, 1954 this automobile was involved in an accident and in the motor vehicle accident report its owner was listed as Grant Foster. San Diego property. Another item carried on Retsof's balance sheet related to the so-called San Diego property, in the amount of $11,000 in respect of a residence purchased in 1954 in National City, California, for Edna Dunn, Mrs. Grant Foster's mother. This item is reflected in check no. 177929, dated March 13, 1954, signed by Grant Foster and drawn on the New York account in the amount of $12,500 payable to Mrs. Grant Foster. The parties have stipulated that $1,500 of that amount was personal, and petitioners on brief have since conceded that the remaining $11,000 relating to the San Diego property was also personal. Retsof Expense Items. In addition to the checks drawn on the New York account listed above relating to assets taken for or in the name of Retsof, the following checks, signed by Grant Foster, were drawn on such account directly for or payable to Retsof: CheckDate ofNo.CheckAmountPayeePurpose1014254/23/52$1,000.00RetsofOpening depositRetsof account atFlorida bank1777716/25/53750.00Richer Nichols Co.Folding shades forHibiscus property17779711/ 3/535,000.00RetsofDeposit - Retsofaccount at Fla.Bank1779511/ 3/539,331.74RetsofDeposit - T. A.WhitesideTrustaccount - ForReimbursement ofcosts1779172/ 9/545,000.00RetsofDeposit Retsofaccount Florida Bank1779283/ 1/54100.00Granville JohnsonHouseboy at Hibiscusproperty1779354/ 5/545,000.00RetsofDeposit Retsofaccount Florida Bank1784341/19/5511.00Lowery Electric Co.For Hibiscus property1788196/22/553,000.00RetsofDeposit RetsofAccount1788499/19/5596.11Fla. Power & Light Co.For Hibiscus property1788579/26/55462.42Atlantic Marine BoatFor "Mi Latina" Yard,Inc.1788589/26/55107.36Fla. Power & Light Co.For Hibiscus property1788599/26/5515.41Peoples Water & Gas Co.For Hibiscus property1788609/26/554.05City of Miami Beach,For Hibiscus propertyFlorida1788619/26/5527.62Southern Bell T & T Co.For Hibiscus property17887310/19/552,500.00RetsofDeposit Retsofaccount Florida Bank2512211/13/5689.95Atlantic Marine BoatFor "Mi Latina" Yard,Inc.2512312/ 1/562,000.00RetsofDeposit Retsofaccount Florida Bank2512634/16/5635.50Paul's Boat Supply, Inc.For "Mi Latina"2512735/ 1/562,000.00RetsofDeposit Retsofaccount Florida Bank2512745/ 3/5612.47Paul's Boat Supply, Inc.For "Mi Latina"2512896/ 4/566.24People's Water & Gas Co.For Hibiscus property2512946/ 6/56808.55Cauley & MartinInsurance forHibiscus property &"Mi Latina"2514076/13/5661.89Atlantic Marine BoatFor "Mi Latina" Yard,Inc.2514096/13/56100.40Lockwood WintertonFor Mesa propertyAgency2514478/ 7/5690.49Paul's Boat Supply, Inc.For "Mi Latina"2514588/27/5636.25Florida Yacht Basin, Inc.For "Mi Latina"2514598/27/5612.00Al GrenierBoat pilot for "MiLatina"2514719/12/5651.72Paul's Boat Supply, Inc.For "Mi Latina"2514749/12/56136.14Atlantic Marine BoatFor "Mi Latina" Yard,Inc.2514769/12/5657.25Florida Yacht Basin, Inc.For "Mi Latina"25148410/ 2/561,000.00RetsofDeposit Hialeah-MiamiSprings Bank accountof Retsof*164 The foregoing checks represent withdrawals by Foster from the New York account for his personal benefit. Retsof was organized and used to conceal the personal nature of investments and expenditures relating to those investments or other expenditures made by Grant Foster with funds diverted from the New York account. It was not organized for a business purpose and did not engage in any substantial business activity. Transfer of $300,000 to Whiteside. On July 10, 1953, check number D177779, in the amount of $300,000, signed by Grant Foster, was drawn on the New York account, payable to the Bank of London - New York. On the same date, Grant Foster addressed a letter to the Bank of London - New York requesting the issuance of a $300,000 cashier's check to Whiteside. Such letter contained the following: We enclose our cheque No. D177779 in the amount of $300,000. - payable to your order and shall thank you to let us have in exchange your cashiers cheque for a like amount payable to the order of T. A. Whiteside. We authorize you to charge our account with your usual charges in this connection. On July 10, 1953, the Bank of London - New York issued its cashier's check number MA 22283*165 in the amount of $300,000 payable to the order of Whiteside. This check was endorsed by Whiteside and deposited in the "T. A. Whiteside trust account" at the Florida National Bank and Trust Company. Thereupon the following steps were taken by Foster and Whiteside to route this $300,000 out of the T. A. Whiteside trust account, through two other bank accounts, and back to the T. A. Whiteside trust account: (a) On August 5, 1953, Whiteside drew a check on his "T. A. Whiteside" trust bank account in the amount of $300,000, payable to a company known as Distributadora Automotriz, S.A. and endorsed this check for deposit to the account of the payee at the Fist National Bank of Miami, on August 6, 1953. (b) On the same date, August 6, 1953, Whiteside drew a check on the account "Distributadora Automotriz" at the same bank for $300,000 payable to the order of Foster Construction Company, and such check was then endorsed "Pay to the order of LAS AVENIDAS-FOSTER CONSTRUCTION, C.A. by Grant Foster, President". Such check was then deposited in the bank account of Las Avenidas at the First National Bank of Miami, on August 6, 1953. (c) Under date of August 13, 1953, Whiteside drew a $300,000*166 check on the "Las Avenidas" account at the same bank payable to "T. A. Whiteside trust account". This check was thereupon deposited in the T. A. Whiteside trust account at the Florida National Bank. Aside from these checks, no other transactions were shown in the accounts "Distributadora Automotriz" or "Las Avenidas" for the month of August, 1953. Subsequent to the return of this $300,000 to the Whiteside trust account, substantially all of this amount was expended by Whiteside for the benefit of Foster Construction, C.A. The July 10, 1953 withdrawal of $300,000 from the New York account did not represent a diversion of corporate funds for the personal benefit of Grant Foster. American Industrial Sales. American Industrial Sales Corporation, hereinafter referred to as AIS, was incorporated in 1946, under the laws of the State of Florida. It engaged in the manufacture and sale of aircraft parts and in the industrial supply business in the Miami area. By the year 1954, AIS had approximately 185 employees in its business in the Miami area, approximately 70 of whom were skilled technicians, with offices and its place of business at 4101 N.W. 25th Street, Miami, Florida. AIS had*167 30 shares of capital stock outstanding in the year 1954. At that time, its capital stock was held as follows: Number ofStockholderShares10Claude D. Richardson10Lloyd A. Hardesty10W. N. Hooper The real property and buildings in which the business of AIS was conducted were owned individually by its stockholders, Richardson, Hardesty and Hooper, each of whom held an undivided one-third interest in: Lot 25 and Tracts (5) and Twenty-six of the LeJeune Terminals, Second Addition * * * Dade County, Florida. This property will sometimes hereinafter be referred to as the LeJeune Terminals property. During the latter part of 1954 Grant Foster met Claude D. Richardson in Miami. Richardson told Foster about the activities of AIS and, after examining its books and records and business premises, Foster decided to make an investment in behalf of Foster Construction, C.A. in AIS stock and the LeJeune Terminals property. Foster was impressed with the ability of Richardson and the manner in which he conducted the operations of AIS, and, inasmuch as he knew nothing about the business, wanted Richardson to continue to be a stockholder of the corporation and to serve*168 as its President. He discussed the matter with Richardson and they agreed upon a plan which contemplated the purchase of the AIS stock and the interests in the LeJeune Terminals property held by Hardesty and Hooper, and an increase in Richardson's 33 1/3 percent interest in the stock and property to 50 percent. On November 30, 1954, an agreement was entered into between Foster Construction, C.A. and Richardson. It was signed by Whiteside as "Attorney in Fact" for Foster Construction, C.A., and by Richardson. It provided, in part, that in the event Foster Construction, C.A. consummated the purchase of the stock interests of Lloyd A. Hardesty and W. N. Hooper in AIS and their interests in the LeJeune Terminals property, the interest of Richardson in the stock of AIS and in the LeJeune property would be increased to 50 percent; Foster Construction, C.A. would lend AIS $100,000 to be used as working capital; Richardson would be President of AIS; and Richardson would pay Foster Construction, C.A. $22,500 over a period of 18 months for the increased interest received by him in the stock of AIS and in the LeJeune property. In November, 1954, Richardson introduced Foster to Hardesty and, *169 after some negotiations, Foster and Hardesty agreed upon the amount Hardesty would receive for his AIS stock and his one-third interest in the LeJeune Terminals property. Thereafter, at Foster's suggestion, they went to Whiteside's office where conferences were held with Whiteside in connection with the preparation of a sales agreement that would be satisfactory to Foster and Hardesty. Some difficulty was experienced at those conferences in reaching an agreement as to the party to be inserted in the sales agreement as purchaser. Alternate names mentioned in several drafts prepared by Whiteside were Foster Construction, C.A., Grant Foster, and T. A. Whiteside, Trustee. Hardesty did not indicate to Foster and Whiteside that he had any preference as to the identity of the purchaser. He did tell them, however, that he did not want to accept a note from a foreign construction company, but would accept such a note if Foster endorsed it. In the final draft of the agreement, which met with the approval of Foster, Hardesty and Whiteside, the person who agreed to purchase Hardesty's stock and property interests was Grant Foster. The agreement was dated December 3, 1954, and provided, in part, *170 as follows: Dear Mr. Hardesty: For and in consideration of the sum of $10,000.00 herewith in hand paid to you, I hereby accept your Agreement to sell and by these presents agree to purchase from you the following corporate stock, together with certain realty lying, being and situate in Dade County, Florida, according to the following terms, to-wit: 1. 33 1/3% of the stock of American Industrial Sales Corporation and Miami Aircraft Supply Co. Inc., both Florida corporations, for the sum of $100,000.000. 2. An undivided one-third interest owned by you in that certin realty, together with improvements thereon, being the real property now occupied by American Industrial Sales Corporation, American Screw and Bolt Corporation and FloridaAviation Corporation for the sum of $25,000.00. The sale and purchase to be made subject to present existing mortgages, liens, improvements, taxes or otherwise. 3. It is understood and agreed * * * that American Industrial Sales Corporation is indebted to you in the sum of $50,000.00, together with interest thereon * * * evidenced by a promissory note bearing date February 2, 1954 and secured by a chattel mortgage * * * of American Industrial*171 Sales Corporation * * * and that as an integral part of this Agreement I hereby ratify said obligation but it is * * * agreed * * * between us that the terms of payment shall be modified so that the corporation may make payments to you in the sum of $50,000.00 * * * with interest at the rate of 6% per annum * * * and that there shall be delivered to you one (1) 27' Owens boat, one (1) Cadillac and one (1) 1954 Mercury automobiles now carried on the books of the corporation, which said items of personal property shall belong to you. * * * It is further understood that I may make prepayment of the entire amount at anytime without penalty. The deposit of $10,000.00 made to you herewith, the receipt of which is hereby acknowledged * * * is a part of the total obligation incurred by me and the balance thereof shall be due and payable as follows: $40,000.00 in cash at the time of closing, * * * January 4, 1955, at 1409 DuPont Building, Miami, Florida; $50,000.00 on or before March 1, 1955 and $25,000.00 on or before September 1, 1955. All unpaid balances on and after the date of closing bear interest at the rate of 6% per annum provided, however, that the principal balance due may*172 be prepaid at anytime without penalty. * * ** * * further * * * I will make and execute promissory notes * * * payable to you evidencing my indebtedness to you and will secure the sum of $25,000.00 thereof by making * * * to you a second mortgage on the real estate, said mortgage to be made * * * to you instantaneous with the delivery to me of the deed of conveyance. * * *It is understood that you also agree to resign from all offices held by you in any of the named corporations and that I shall have the right to assign this Contract. It is further understood that you will make necessary assignments of your stock in contemplation of this Agreement to be escrowed by me as collateral security for payments called for to be made; that I will also make and execute instruments reassigning this stock to you, which said instruments shall also be escrowed conditioned that should I default in the terms of this Agreement the stocks and reassignments shall be delivered to you. * * *You are to acknowledge your acceptance of the terms set forth herein. Very truly yours, GRANT FOSTER /s/ T. A. Whiteside Attorney in Fact I * * * accept the terms and conditions herein, *173 and acknowledge receipt of a deposit of $10,000.00 this 3rd day of December, 1954. /s/ Lloyd A. Hardesty Under date of January 10, 1955, Hardesty conveyed his interests in the LeJeune Terminals property to "T. A. Whiteside, trustee". Thereafter, pursuant to the December 3, 1954, agreement between Foster and Hardesty, an escrow letter was addressed to the escrow agent, a Miami attorney named Bell, by Whiteside and Hardesty, under date of January 13, 1955, transmitting the following items, among other things, to be held in escrow: 1. Deed from Hardesty to T. A. Whiteside, trustee; 2. Promissory note dated January 10, 1955 in the amount of $25,000.00 executed by Whiteside, as trustee, payable to Hardesty; 3. Promissory note dated January 10, 1955, in the amount of $50,000.00 executed in the name of Foster Construction, C. A. by Whiteside, "Attorney-In-Fact", and endorsed individually and personally by Grant Foster. 4. Promissory note dated January 10, 1955, in the amount of $50,000.00 from American Industrial Sales Corporation payable to Lloyd A. Hardesty endorsed individually and personally by Grant Foster (as a substitute for a previous promissory note dated February 2, 1954, from*174 AIS to Hardesty); 5. Check in the sum of $40,000.00 payable to Hardesty drawn on the T. A. Whiteside, trustee, account; 6. Hardesty's stock certificates in AIS and Miami Aircraft Supply Company endorsed by Lloyd A. Hardesty to T. A. Whiteside, trustee. The escrow letter, in describing the items transmitted and the undertakings of the parties, further provided in part as follows: 11. Reassignment executed by Foster Construction, C.A. of all of the capital stock hereinabove mentioned * * * to Lloyd A. Hardesty, such Reassignment to provide that it is being delivered to you as escrow agent conditioned upon the fulfillment of all of the terms and conditions contained and outlined in that certain Letter-contract dated the 3rd day of December, 1954 by and between Lloyd A. Hardesty and Grant Foster acting by and through T. A. Whiteside, his Attorney-In-Fact. When the recordation of the instruments * * * is effected, you are then authorized to deliver forthwith to Lloyd A. Hardesty, the originals of all of the Promissory Notes hereinabove mentioned together with the check in the sum of Forty Thousand Dollars ($40,000) * * *. At the same time you shall deliver to Grant Foster or*175 his Attorney-in-Fact, acting for him and in his stead, any instruments held in your possession which, under the terms of the said Letter-Contract dated December 3rd, 1954 should be delivered to him or his representatives. * * * The following checks were issued to Lloyd A. Hardesty by Whiteside in payment for Hardesty's AIS stock and the LeJeune Terminals property, on the trust account entitled "T. A. Whiteside", at the Florida National Bank & Trust Co.: Date ofCheckCheckNumberAmountPurpose12/3/54203$10,000.00Deposit on purchase agreement1/14/5520640,000.00Payment on purchase2/28/55207150,000.00Payment on purchase2/28/552072484.98Interest9/6/55221425,982.29Payment on purchase The last four of these payments were recorded on a ledger sheet entitled "FOSTER CONSTRUCTION C.A." maintained in the law office of Whiteside. Several days after the December 3, 1954 letter-agreement between Foster and Hardesty was signed Foster and Paul Cheesman, Foster's brother-in-law, went to Hardesty's office. Foster then told Hardesty that Cheesman was coming into the company to represent Foster's interests in AIS. Cheesman*176 subsequently became the president of AIS. In November of 1954, Grant Foster visited the offices of W. N. Hooper at Houston, Texas, to arrange for the purchase of the interests of Hooper in AIS and in the LeJeune Terminals property. Foster was accompanied by C. D. Richardson. At that meeting, the terms of sale for Hooper's interests were discussed, and as a result of the conference, Grant Foster prepared a letter agreement dated November 16, 1954. The letter, addressed to Hooper, provided as follows: On this date I am paying to you $10,000.00 for a 30-day option to purchase your stock interest (33 1/3%) of outstanding stock in the following corporations: American Industrial Sales Corporation, American Screw & Bolt Corporation, and Miami Aircraft Supply Company, Inc., all Florida corporations. This option also includes your equity in the real estate in Miami now occupied by American Industrial Sales Corporation, American Screw & Bolt Corporation, and FloridaAviation Corporation. The purchase price for real estate and the aforementioned stock interest is $90,000.00. I am submitting to you my check No. D177996 in the amount of $10,000.00 today. If this option is not revoked by mutual*177 consent, or if I do not exercise said option within 30 days, I will forfeit the $10,000.00 paid to you on this date. It is also understood that you will resign immediately as an officer and director of said corporations on the completion of this option. I herein agree that the $34,000.00 balance on $50,000.00 note exercised by the American Industrial Sales Corporation to you on February 2, 1954, will be paid by the Corporation and I will personally endorse or guarantee said note. The Corporations upon completion of this option will release you from all debts and obligations and you in turn will release said Corporations from all debts and obligations except the aforementioned $34,000.00. This option is to confirm our agreement of November 1, 1954. Sincerely, /s/ Grant Foster, Grant Foster, President I herein agree to the contents of the aforementioned option. /s/ W. N. Hooper W. N. Hooper, Dated Hooper asked Foster to sign the letter agreement personally, rather than as president of the Foster Construction, C.A., as Hooper was uncertain of the legal status of a corporation created under the laws of a foreign country, and Foster complied with his request. The option agreement*178 with Hooper was closed in March, 1955, after having been extended several times. The transaction with Hooper, in summary, was as follows: Foster's ObligationsSales price of 1/3 interest of W. N. Hooper$ 90,000.00Balance due on note owed to W. N. Hooper from AIS34,000.00Interest payment on AIS note to Hooper2,270.33Total money due$126,270.33The following checks, signed by Grant Foster, were drawn on the New York account, payable to W. N. Hooper, in payment for Hooper's interests in AIS and in the LeJeune Terminals property: CheckDate ofNuumberCheckAmountPurposeD17799611/16/54$ 10,000.00OptiondepositD1784542/11/551,205.00InterestD1784683/7/55115,065.33Purchaseprice$126,270.33These checks were issued to purchase Hooper's AIS stock and interest in related real estate for Foster Construction, C.A. and did not represent a diversion of corporate funds for Foster's personal benefit. The contemplated plan for Richardson to acquire a 50 percent interest in AIS never materialized. Instead, on March 31, 1955, an agreement was entered into between Richardson and "Grant Foster or*179 his nominee" providing for the sale of Richardson's stock interests in AIS and Miami Aircraft Supply Company and in the LeJeune Terminals property. In that agreement, Foster agreed to pay $140,000 to Richardson for those interests in the following manner: 1. $25,000.00 in cash to be paid upon the execution of the agreement, and 2. the remaining $115,000.00 payable by Grant Foster as follows: a. $38,300.00 payable six months from March 31, 1955; b. $38,300.00 payable twelve months from March 31, 1955, and c. $38,400.00 payable eighteen months from March 31, 1955. Foster also agreed to give Richardson a promissory note in the amount of $115,000, bearing interest at the rate of six percent, endorsed personally by Foster, and to pay Richardson the amount of $72,000 owed by AIS to Richardson, $40,000 of which was to be paid at the time of the closing of the transaction and the remaining $32,000 90 days thereafter. On April 1, 1955, Richardson conveyed his interest in the LeJeune Terminals property to T. A. Whiteside, trustee, for $25,000 cash. The stock certificates of Richardson in AIS and Miami Aircraft Supply were delivered to R. K. Bell, attorney and escrow agent under*180 an escrow agreement entered into on April 1, 1955 between Richardson and Foster. Foster did not pay the $115,000 to Richardson pursuant to his promissory note. At the time the first payment under the promissory note came due on October 1, 1955, AIS and Grant Foster, as plaintiffs, brought a complaint for an accounting against Claude D. Richardson, Jr. and R. K. Bell, defendants, in the Circuit Court for Dade County, Florida, alleging breaches of a fiduciary relationship by Richardson to AIS and also misrepresentations by Richardson to Foster. At that time, Foster paid the first amount due under the promissory note, $38,300, into the registry of the Court pending resolution of the litigation. The litigation between AIS, Richardson, and Grant Foster was settled by agreement on December 2, 1955. In settlement of their dispute, AIS and Foster agreed to pay to Richardson the following: 1. The sum of $20,000 in cash to be paid from the funds held in the Registry of the Court; 2. Assignment by AIS to Richardson of four accounts receivable; 3. The transfer to Richardson of all aircraft parts, accessory materials, goods, merchandise, equipment (except station wagon and forklift loader), *181 stock and inventories at that time owned by Cayman Corporation and located in Sebring, Florida. Richardson agreed to accept the payments and assignments as full and complete payment of all obligations due to him from Foster under the agreement of March 31, 1955, between Richardson and Foster, and under the terms of the $115,000 promissory note. It was further agreed that the stock in AIS and Miami Aircraft Supply Company held by R. K. Bell as escrow agent was to be delivered to Foster. Petitioners have conceded that $105,000 used in the acquisition of Richardson's stock in AIS, which was withdrawn by Foster from the New York account, was a personal expenditure by Grant Foster. The checks signed by Foster on the New York account, which were involved in the purchase of that stock, were the following: CheckCheckNumberDatePayeeAmount1784161/7/55Thomas Aviation Sales Company$95,000.00 81784924/25/55Claude D. Richardson, Jr.10,000.001788649/30/55T. A. Whiteside38,300.00 8The first check, in the amount of $95,000, was originally used as hereinafter*182 noted, in acquisition of the first inventory of Cayman Corporation (hereinafter described) from Thomas Aviation Sales Company. Part of that inventory acquired by the check for $95,000 was transferred to Richardson in December of 1955 when the litigation between Richardson and Foster was settled. Petitioners have conceded that $75,000 of such amount was attributable to Grant Foster's acquisition of Richardson's stock in AIS. The second check for $10,000 was paid to Richardson pursuant to the March 31, 1955 purchase agreement. With respect to the third check, payable to T. A. Whiteside for $38,300, T. A. Whiteside, on October 1, 1955, had purchased a cashier's check, payable to the Clerk of the Dade County Circuit Court, which was paid into the Registry of the Dade County Circuit Court when the Bill of Complaint, heretofore mentioned, was filed on October 3, 1955. Upon the settlement of the litigation, the sum of $20,000 was disbursed to Richardson pursuant to the December 2, 1955 settlement agreement; $215 was applied to payment of costs; and the balance of $18,085 was deposited in the account of Foster Construction, C.A. at the Bank of London - New York about January 12, 1956, after*183 having been transmitted through Whiteside's office. In addition to the $20,000 component of the $38,300 check conceded by petitioners, $215 allocable to that check was withdrawn for the personal benefit of Grant Foster; the remaining $18,085 component thereof did not represent a withdrawal for his personal benefit. In May of 1956, as already noted, Whiteside and Foster severed their relationships. By letter dated May 25, 1956, Whiteside transmitted to Grant Foster a deed from Whiteside and his wife to Foster Construction, C.A. dated April 2, 1956, conveying to that corporation the LeJeune Terminals property. Under date of June 11, 1956, a "Business Property Lease" was entered between Grant Foster and Barbara Dunn Foster, as landlords, and Aircraft Supplies, as lessee, relating to the lease of a building located at Lot 25, LeJeune Terminals, 2nd addition. Under such lease, Grant Foster and his wife leased the LeJeune Terminals property to Aircraft Supplies for a term of two years beginning June 11, 1956, at a total rental of $9,600 payable $400 on the 11th day of each calendar month. In their delinquent joint Federal income tax return for the year 1956, Foster reported rental income*184 from the LeJeune Terminals property in the amount of $8,580. Servicios Aerotecnicos Latino Americanos (SALA). Servicios Aerotecnicos Latino Americanos (hereinafter referred to as SALA) was a Costa Rican corporation. Prior to the year 1954, and at all times material herein, SALA was engaged in the business of overhauling and maintaining aircraft engines and airframes at San Jose, Costa Rica. It employed approximately 100 persons, and was having financial and operational problems. In the early part of 1954, Robert Anson, an officer of SALA and one of its stockholders, took a leave of absence with the objective of strengthening the company by getting some persons connected with the aviation industry, and others, who could bring more work to SALA, to participate in the purchase of its stock from the existing stockholders. Anson discussed the activities of SALA with John Paul Riddle, who was connected with the Riddle Airlines, Claude Richardson, then with AIS, Basil Autry, one of the principal stockholders of International Aircraft, Inc., and Grant Foster, and they agreed to participate in the purchase of the stock. As of June 8, 1954, the stock book of SALA reflected the following*185 ownership of its stock: International Aircraft, Inc.6,196 sharesRoberto Kruse2,814 sharesRobert Anson950 sharesSantiago March Palau40 sharesOn June 8, 1954, International Aircraft, Inc., and "Robert Anson and Associates", entered into a "PURCHASE AGREEMENT" which provided, in part, as follows: This agreement entered into * * * this eighth day of June, 1954 * * * by and - between International Aircraft, Inc., a Panamanian Corporation * * * the seller, and Robert Anson and Associates * * * the buyers * * *. It is agreed as follows: * * * sellers will sell to the buyers 6,196 * * * shares of stock of * * * S.A.L.A., upon the following terms and - conditions: 1. Total price of said stock shall be sold for $322,192.00 * * * which shall represent 6,196 shares at $52.00 * * * per share. 2. Buyers shall pay sellers the amount of $10,000.00 * * * upon the signing of this agreement. 3. Forty-five days after the signing of this agreement, the buyers may pay an additional $10,000.00 * * * to the sellers, and if not paid this agreement ceases and terminates. 4. Sixty days after the signing of this agreement, the buyers may pay an additional $40,000.00*186 * * * and shall receive 1,000 shares of SALA stock. 5. If the foregoing conditions * * * have been complied with, * * * buyers shall have an additional sixty days * * * to purchase the remaining 5,196 shares of SALA stock for the remaining balance of $262,192.00 * * *. The sellers shall furnish to the buyers the following items and documents: 1. At the same time that the buyers pay to sellers the second $10,000 * * * the sellers agree to furnish authorization of International Aircraft, Inc. * * * to buy the SALA stock originally, and will provide buyers with a copy of the resolution. 2. At the same time * * * the sellers will furnish to buyers the authorization for International Aircraft, Inc. * * * to * * * sell said SALA stock to the buyers * * * and will furnish a copy of the resolution authorizing said sale to the buyers. 3. * * * at * * * time of payment of * * * second $10,000.00 * * * International Aircraft, Inc. * * * will furnish to buyers a copy of the last Audit Statement and a current Financial Statement of SALA. 4. International Aircraft, Inc. * * * agrees to * * * restrict the management of SALA * * * from making any unusual or unnecessary expenditures or*187 commitments from the date of the signing of this agreement * * *. 5. * * * International Aircraft, Inc. * * * shall see to it that the stock is properly transferred to the buyers when the conditions of this agreement have been complied with. Also * * * International Aircraft, Inc. * * * shall furnish proper evidence of ownership of said stock when the $40,000.00 * * * is to be paid under the terms of this agreement. * * *8. The buyers shall have the right to pay off the full purchase price at any time during the life of this agreement. Thereafter, International Aircraft and Anson executed a receipt and payment schedule dated July 20, 1954, which provided in part, as follows: This receipt and payment schedule applies to the agreement of June 8, 1954. When the first $60,000.00 is paid as outlined, Robert Anson will receive 1,000 shares of SALA stock, the balance will be paid as hereinafter outlined. Payment is hereby acknowledged by International Aircraft, Inc. of $20,000.00 * * * for purchase of 6,196 shares of stock in Servicios Aereotecnicos Latino Americanos, S.A. * * * in addition to $10,000.00 paid June 8, 1954. It is understood and agreed that an additional $15,000.00*188 will be paid prior to July 30, 1954 and that a promissory note due August 15, 1954 made and guaranteed by Florida Trading Company payable to International Aircraft, Inc. in the amount of $65,000.00 will be delivered to International Aircraft, Inc. prior to July 30, 1954. It is also understood and agreed that three additional notes payable to International Aircraft, Inc. will be signed and guaranteed * * * and delivered to International Aircraft, Inc. prior to August 15, 1954 in the following amounts and bearing interest * * * at 7% per annum from July 15, 1954.Note 1 - due Jan. 15, 1955$ 79,036.00Note 2 - due June 15, 195532,500.00Note 3 - due Jan. 15, 195632,500.00$144,036.00It is further understood and agreed that the total purchase price for 6,196 shares of SALA stock shall be $254,036 provided the above payment schedule is met. In the event of default of any one of the * * * payments scheduled the purchase price will be $322,192.00 and an additional payment of $68,156.00 will be due ten days after such default. It is understood and agreed that 6,196 shares of stock in * * * [SALA] will be delivered to Robert Anson or his designees upon payment*189 of $15,000.00 due July 30, 1954 and upon payment to International Aircraft, Inc. of note for $65,000.00 due August 15, 1954. This payment schedule changes the method of payment of the first $60,000.00 and the remaining balance as set forth in the agreement of June 8, 1954 and in no way affects the transfer of stock as set forth in agreement of June 8, 1954. About July 31, 1954, International Aircraft, Inc. executed the following receipt: Received from Basil Autry $15,000.00 (Fifteen Thousand dollars) payment on account for SALA stock in accordance with agreement dated July 20, 1954 between International Aircraft, Inc. and Robert Anson. Upon payment of a further $65,000.00 (Sixty-Five Thousand dollars) on or before August 15, 1954 International Aircraft, Inc. will deliver 6196 shares of SALA stock to Mr. Basil Autry provided Mr. Autry returns a receipt from International Aircraft, Inc. to Mr. G. Xucla, dated July 20, 1954 to International Aircraft, Inc., and also provided he gives notes to International Aircraft, Inc. totaling $144,036.00 as scheduled in above mentioned agreement dated July 20, 1954. In the event satisfactory notes, or cash payment in lieu of notes, are not*190 payment in lieu of notes, prior to August 15, 1954, International Aircraft, Inc. will then release SALA stock to Basil Autry in proportion to cash paid against the total purchase price. It is agreed that the 6196 shares of SALA stock will be airmailed to the Pan American Bank of Miami not later than August 3, 1954 with instructions to the Bank to deliver the stock to Basil Autry in accordance with this agreement. It is expressly understood that the agreement of July 20, 1954, together with this agreement, calls for sale and payment of the total 6196 shares of SALA stock owned by International Aircraft, Inc. Under date of August 11, 1954, Robert Anson assigned his interest in the June 8, 1954 purchase agreement by an assignment which provided as follows: For value received I, hereby bargain, sell, transfer, and assign all of my rights, title, and interest in and to that certain contract of sale and purchase dated June 8, 1954 and modified July 20, 1954 and the parties being International Aircraft, Inc., * * * and Robert Anson to Mr. Basil Autry. It is expressly and clearly understood that the first forty thousand dollars paid to International Aircraft for one thousand shares*191 of SALA stock was money belonging to Lineas Aereas de Nicaragua (LA Nica) and that one thousand shares of SALA stock will be immediately turned over to La Nica upon receipt of same. Robert Anson /s/ Robert Anson Witness: /s/ Grant Foster, /s/ Michael Angino Robert Anson and Roberto Kruse retained Jack W. Thornburg, the president of International Aircraft, Inc., to negotiate the sale of the 6,196 shares of SALA stock, and informed him as to the price and terms that would be acceptable. In August 1954 he was advised of the discussions Anson had had with Grant Foster with respect to the sale of SALA stock when Foster visited SALA to get an airplane repaired, and was told that he could meet Foster in Miami. Thornburg went to Miami and had several conferences with Foster. He informed Foster that he was representing Anson and Kruse and had been authorized by them to negotiate the sale of the 6,196 shares of SALA stock. Foster told Thornburg that he knew that the SALA stock was for sale; that he was familiar with the shop and equipment, and the general financial condition, of the company; that he was interested in buying its stock; and that he owned Foster Construction Company of*192 Venezuela and was therefore able to handle the transaction. They reached an agreement as to the approximate terms and price of the 6,196 shares, and made arrangements to discuss the transaction further on the following day. On the following day, due to other commitments, Foster was unable to discuss the matter further with Thornburg and referred Thornburg to Whiteside to complete the negotiations. Whiteside thereupon completed negotiations for the purchase of the SALA stock, with no important or significant changes in price or terms of payment from those discussed by Foster and Thornburg. On August 16, 1954, Whiteside, as trustee, issued his check for $65,000 on his T. A. Whiteside Trust Account, to purchase a cashier's check from the Florida National Bank and Trust Company in that amount, payable to International Aircraft. Upon receipt of that check on or about August 16, 1954, Jack W. Thornburg, for International Aircraft, executed assignments of three certificates of SALA stock for 6,196 shares to "T. A. Whiteside, Trustee". The certificate numbers were 010, 013 and 019. With respect to 5,196 of the above 6,196 shares of stock, a document entitled "Voting Trust Agreement" *193 was executed under date of August 16, 1954, and amended under date of November 15, 1954, to provide that Grant Foster and John Paul Riddle would be designated as "voting trustees" to vote 5,196 shares of SALA stock for a period of not more than 10 years. Riddle declined to serve as voting trustee, and a successor voting trustee, C. J. McCann, Jr., was designated in place of Riddle. The 6,196 shares held by T. A. Whiteside, Trustee (Certificate Nos. 010, 013, and 019) were cancelled and the following stock certificates of SALA were issued: CertificateStockholder, perNo. ofDate of StockNumberStock Certificate BookSharesCertificate* 020(Missing)022Basil Autry1249-9-54023Foster Construction, C.A.1,6199-9-54024John Paul Riddle2499-9-54025T. A. Whiteside, Trustee2,5799-9-54** 026Jack W. Thornburg6259-9-54* 028Foster Construction, C.A.1,0003-17-55Total6,196*194 In connection with the acquisition of the 6,196 shares of SALA stock the following additional payments were made by Whiteside with the following checks drawn upon his T. A. Whiteside Trust account at the Florida National Bank and Trust Company: Date of CheckPayeeAmountJan. or Feb. 1955International Aircraft, Inc.$55,425.11August 15, 1955International Aircraft, Inc.43,036.13Additional shares of the stock of SALA were purchased from Kruse and Thornburg with the following checks drawn on the New York account: CheckDate ofNo.CheckPayeeAmountD1779668-12-54Roberto Kruse$90,000.00D17799211-11-54Jack W. Thornburg25,625.00 The check payable to Kruse for $90,000.00 was issued for the purchase of SALA stock certificates 014 and 017 for 1,500, and 1,314 shares, respectively. The check payable to Thornburg for $25,625 was for the purchase of SALA stock certificate 026 for 625 shares. These checks were used to pay for stock of SALA purchased by Foster Construction, C.A., and did not represent any diversion of corporate funds for Grant Foster's personal benefit. The SALA stock certificate book states that the*195 certificates 014 and 017 purchased from Kruse, certificate 026 purchased from Thornburg and certificate 025 in the name of T. A. Whiteside, Trustee, were cancelled, and that certificates 021, 027, and 030 were issued, as follows: Certifi-Stockholder, perDate ofcateStock CertificateNo. ofStockNumberBookSharesCertificate021Foster Construction,C.A.2,8149- 9-54027Foster Construction,C.A.62512- 1-54030Foster Construction,C.A.2,57911-14-55 The stock certificate book of SALA was maintained in the law offices of Mariano Anderson, a Costa Rican lawyer. Anderson addressed a letter to Whiteside bearing date of January 29, 1955, which stated as follows: As Trustee for certificate No. 025 for 2579 shares of the stock of Servicios Aerotecnicos Latino Americanos, S.A., known also as SALA, and at your request I beg to inform you that outstanding stock of the Company at this date is distributed as follows: Certificate No. 16Robert Anson Bowron950 sharesNo. 17Santiago March Palau40 sharesNo. 20Foster Construction, C.A.1,000 sharesNo. 21Foster Construction, C.A.2,814 sharesNo. 22Basil Autry124 sharesNo. 23Foster Construction, C.A.1,619 sharesNo. 24John Paul Riddle249 sharesNo. 25T. A. Whiteside, Trustee2,579 sharesNo. 27Foster Construction, C.A.625 sharesTotal outstanding stock10,000 shares*196 Prior to the sale of the SALA stock in 1954 Robert Darnsted was the president of SALA, and Darnsted and Roberto Kruse were the "active" managers of the corporation. After the sale Grant Foster became president and Robert Anson became the general manager and executive vice president. Stock certificates 021 to 030, inclusive, were signed by Grant Foster, as president, and by Mariano Anderson, a Costa Rican attorney, as secretary. SALA "related" items. The following checks relating to SALA were signed by Grant Foster and drawn for corporate purposes on the New York account: Date ofCheckItemCheckNumberPayeeAmount19/10/54D177977Robert Anson$20,000.0029/13/54D177978James Wattenberger5,000.0039/13/54D177979James Wattenberger10,000.00410/ 7/54D177986Florida Aircraft Radio & Marine, Inc.1,037.50511/ 7/54D177991Robert Anson10,000.00611/17/54D177997Jack Morton4,700.00712/13/54D178405Florida Aircraft Radio & Marine, Inc.4,266.67812/20/54D178410Twin City Chevrolet, Inc.3,077.9891/20/55D178438C.A.T.S.A.20,000.00102/16/55D178460Civil Air Transport, S.A.30,500.00112/16/55D178461S.A.L.A.10,000.00125/12/55D178495SALA Operating Fund5,000.00135/12/55D178496Servicios Aerotecnicos Latino Americanos,20,000.00S.A.13A6/13/55D178813Servicios AerotecnicosLatino Americanos,20,000.00S.A.147/12/55D178828Aircraft Radio Marine2,581.41157/19/55D178834SALA Operating Fund500.00168/ 4/55D178838Oakland Airmotive97.501710/27/55D178874Aircraft Supplies14,079.611811/ 1/55D178878Coral Gables First Nat. Bank2,880.001912/27/55D251202Florida Aircraft Radio Marine2,145.15203/ 1/56D251241Cash1,000.00213/29/56D251251James D. Wattenberger4,000.00226/ 4/56D251287Jefferson Stores600.00236/ 4/56D251288Marseille Apartments, Inc.266.66*197 Whiteside 1956 Settlement and Accounting. During the years 1950 through 1956, funds transferred to Whiteside by Foster for investment, trust or other purposes exceeded $1,075,033.27, without taking into account items received by Whiteside for miscellaneous Retsof expense items, costs, and other incidental items. Expenditures made by Whiteside exceeded $1,009,525.85, again without taking into account miscellaneous items for Retsof, Tambor, or Cayman, and legal fees or other charges due Whiteside. A summary of the more significant items is as follows: Item(Checks listed below were drawnReceived byUsed orExpendedDateon the New York account)Whitesideby Whiteside12/19/50Check No. D100922$ 10,000.001/24/51To purchase two $5,000.00 cashier'schecks$ 10,000.00 *10/31/51Check No. D10126722,526.48To pay income tax 1947-195022,526.48 *11/ 1/51Check No. D10126910,500.0011/ 1/51Option deposit Springs Rest.10,500.0011/ 1/51Check No. D101279114,500.0011/15/51Purchase Springs Rest.102,031.25 **11/15/51Purchase Springs Rest.1,760.30 **2/20/52Check No. D10140525,000.002/29/52For Stadnik loan25,000.00 *3/15/52Check No. D10141290,550.003/18/52Check No. D1014132,000.003/25/52Purchase Mesa property90,391.00 ***1952Purchase Mesa property1,217.70 ***1952Mesa property550.00 ***1952Mesa property140.66 ***4/23/52Check No. D101424$ 35,000.001952Political contribution$ 35,000.00****11/ 6/52Check No. D101496200,000.0011/ 6/52Trust corpus200,000.00*****5/ 8/53Check No. D17775950,000.00Coral Gables Bank Stock46,000.00******5/15/53Check No. D1776339,000.005/29/53Purchase Hibiscus prop.35,100.00******6/16/53Purchase Hibiscus prop.3,900.00******7/30/53Check No. D1778015,000.009/10/53Purchase Mi Latina17,180.00******7/10/53Check No. D17779300,000.00SALA Stock8/10/54To Int'l Aircraft65,000.00 ****2/55To Int'l Aircraft55,425.11 ****8/15/55To Int'l Aircraft43,036.13 ****AIS Stock and land - Hardesty12/ 3/54to Hardesty10,000.00 ****1/14/55to Hardesty40,000.00 ****2/28/55to Hardesty50,000.00 ****2/28/55to Hardesty484.93 ****9/ 6/55to Hardesty25,982.29 ****4/13/55From Whiteside to account "Foster80,000.00 ****Construction, C.A." at Bank ofLon-don-New York9/30/55Check No. D17886438,300.0038,300.00 ****Richardson lawsuit1952-1956MiscellaneousCollections on Springs mortgage68,038.66Collection on Stadnik note6,250.00Distributadora Automotriz31,370.13Sale of airplane - P-3817,000.00$1,075,035.27$1,009,925.85*198 When Whiteside and Foster severed their relations in 1956, they entered into agreements dated May 25, 1956, providing for an accounting of the properties and income of the Grant Foster Trust and the release of Whiteside by Foster from any and all claims in respect of his trusteeship, as heretofore noted. Another agreement, also dated May 25, 1956, was entered into between Whiteside, *199 as party of the first part, and Grant Foster, individually, and Foster Construction, C.A. acting through its President, Grant Foster, as parties of the second part. It provided, in part, that "during the past several years" the parties of the second part had delivered sums of money aggregating $503,658.79 to the party of the first part; that from time to time party of the first part expended various sums of money, "which he held in trust either as Trustee or in the exercise of a Power of Attorney which was held by party of the first part for parties of the second part," in the total aggregate sum of $441,228.03; that included in the latter amount was $35,000 which the parties of the second part refused to accept as an expenditure made in their behalf by the party of the first part but which they would accept as a payment to the party of the first part of attorneys' fees for services rendered; that the party of the first part agreed to pay to Foster Construction, C.A. for the use and benefit of the parties of the second part, the amount of $62,430.76; and that the parties of the second part agreed to accept payment of that amount as a full and complete accounting by party of the first*200 part for all monies received or delivered to the party of the first part for the use and benefit of the parties of the second part, and to discharge and release the party of the first part from any conceivable claim which might be brought against him. The amount of $503,658.79 referred to in the May 25, 1956, agreement was regarded by the parties to such agreement as being made up of the following components: Items Received by Whiteside:Amount$300,000.00 check no. D177779$300,000.00Collections made by Whiteside on the Springs Restaurant, Inc.68,038.66mortgageCollection on John Stadnik note6,250.00Retsof of Miami, Inc. - Coral Gables Bank Stock46,000.00Distributadora Automotriz (Items not charged as income to31,370.13Foster- source or transaction not identified Sale of airplane - P-3817,000.00on record)Amount to Whiteside - political contribution35,000.00$503,658.79During the year 1956, the following checks, signed by Grant Foster, were drawn on the New York account for costs incurred relative to such final accounting and settlement for legal, accounting, and investigation services: Check No.Date of CheckPayeeAmountD2512281/25/56Floyd Miner$ 122.65D2512694/27/56Floyd Miner1,000.00D2512715/ 1/56Floyd Miner1,000.00D2512835/17/56Floyd Miner1,000.00D2512825/ 9/56Investigators, Inc.1,243.77D2512966/ 7/56Investigators, Inc.750.00D2512996/13/56Floyd Miner1,800.00D2514066/13/56Joseph Fitzgerald3,707.54D2514347/18/56Investigators, Inc.150.00D2514558/17/56A. Frank Katzentine10,054.25$20,828.21*201 One-half of the total amount of these checks represented diversions from the New York account for the personal benefit of Grant Foster, and the remaining one-half represented corporate expenditures. On July 19, 1957, three days after Foster first learned of the income tax investigation of his affairs, he signed an affidavit at Whiteside's request which read in part, as follows: * * * GRANT FOSTER, * * * upon being duly sworn, deposes and says: 1. That he is President of Foster Construction, C.A., a Venezuelan corporation, and has been President of such corporation continuously since its organization; and that he is also Grantor under that certain Trust Agreement dated the 18th day of November, 1952, wherein and whereby T. A. Whiteside was appointed and designated as Trustee. 2. That during that period T. A. Whiteside acted as attorney for Foster Construction, C.A.; further, that T. A. Whiteside had power of attorney, duly and properly executed, to act in all matters for and in behalf of Foster Construction, C.A., and power of attorney duly and properly executed, to act in all matters for and in behalf of Grant Foster, individually; further, Affiant states that with his full*202 knowledge and prior consent, the said T. A. Whiteside mingled funds of Foster Construction, C.A., Grant Foster individually, and Grant Foster Trust with his own personal funds. Further, Affiant sayeth not. Cayman Corporation. Cayman Corporation was a Florida corporation formed on January 5, 1955, with address at 4101 N. W. 25th Street, Miami, Florida. Its Federal income tax return for the year 1955 was filed with the district director of internal revenue, Jacksonville, Florida. Its principal business activity was stated on that return to be the "Retail and wholesale sale - aircraft parts". The capital stock of the Cayman Corporation consisted of 100 shares of common stock having a par value of $100 per share. In January 1955, 75 shares were issued to Grant Foster, 15 to Claude D. Richardson, and 10 to Jack Morton. On December 7, 1955, Richardson and Morton assigned the 25 shares issued to them to Grant Foster. The following checks, signed by Grant Foster, were drawn on the New York account: CheckDate ofDate ChargedNumberCheckby BankPayeeAmount1784161/7/551/10/55Thomas Aviation Sales$95,000.0017841712/31/541/4/55Jack M. Brown500.001784201/10/551/13/55Cayman Corporation9,500.001784522/10/552/14/55Jack M. Brown1,000.001784592/14/552/21/55Alamo Motor Lines5,573.0917888811/21/5511/29/55Sebring Air Terminal1,209.16*203 A ledger sheet of Cayman Corporation entitled "Loans Payable - Foster Construction, S.A." contains the following 1955 debit and credit entries: 1955DebitsCreditsJan. 10$ 9,500.001195,000.0011500.00Feb. 154,291.20105,000.00Dec$75,000.00Nov. 211,209.16500.00Dec. 3110,000.00The $95,000 check to Thomas Aviation Sales Co. was used to purchase a supply of used aircraft parts which constituted the first inventory of Cayman Corporation. As heretofore noted, in December of 1955, when the litigation relating to the sale by Richardson of stock in AIS to Foster was settled, the aircraft parts then owned by Cayman Corporation were transferred to Richardson as part of the overall settlement, and petitioners have conceded that $75,000 of the $95,000 expended for aircraft parts was attributable to Foster's acquisition of Richardson's stock in AIS. Jack M. Brown was an employee of Cayman Corporation. The check issued to Alamo Motor Lines was for freight charges incurred in connection with the purchase by Cayman of some aviation equipment. The check issued to the Sebring Air Terminal was for storage charges. All of the*204 foregoing checks, relating to Cayman Corporation, represent diversions of funds of Foster Construction, C.A. for the personal benefit of Grant Foster. Repuestos de Tractores. In 1952, the demand for tractor rollers in Venezuela exceeded the supply and Grant Foster decided that tractor rollers and tractor parts manufactured by Craig Carroll Company of Portland, Oregon, could be sold in Venezuela at a profit. His original plan was to engage in this business through Foster Construction, C.A. His Venezuelan attorney advised him, however, that the Venezuelan government might "frown" upon the sale by a construction company of the Carroll rollers, and suggested that Foster organize a Venezuelan corporation to engage in their distribution and sale. On June 6, 1952, a corporation, known as Repuestos de Tractores, was incorporated under the laws of Venezuela. Grant Foster became the president and manager of the corporation. Its capital stock was issued as follows: Luis Beltran Gonzalez275 sharesGrant Foster75 sharesEugene Sullivan75 sharesWayne Foster75 shares Gonzalez was the Venezuelan attorney for Foster Construction, C.A.; Sullivan was an officer of Foster*205 Construction, C.A.; and Wayne Foster was Grant Foster's brother and an employee of Foster Construction, C.A. An account was opened at the Bank of London - New York on or about July 6, 1953, with the following title: Repuestos De Tractores, C.A. c/o Bank of London & South America, Ltd., Caracas, Venezuela. The signature card for such account filed with the bank shows the signature of "Grant Foster, President" as the only person authorized to draw upon such account. During the years 1952-1954 rollers and roller parts were purchased from Craig Carroll Company for sale through the Venezuelan corporation, Repuestos de Tractores. Bills for these purchases were sent by Craig Carroll Company to Foster Construction, C.A. in Venezuela. The following checks, signed by Grant Foster, payable to Craig Carroll Company, were drawn on the New York account to pay for the rollers and roller parts purchased: Check No.Date of CheckAmountD1014113/10/52$31,323.20D1014174/ 3/528,618.56D1014194/11/52983.14D1014274/30/526,748.80D1014506/15/5226,617.92D1014717/29/5220,603.65D1014809/ 9/521,381.39D1779364/ 5/545,750.00The business*206 of Repuestos de Tractores was unsuccessful. An attempt to sell the Craig Carroll rollers below cost was only partly successful, and the rollers not sold were used by Foster Construction, C.A. On March 7, 1955, Foster wrote a letter to the Bank of London - New York, which read, in part, as follows: * * *This letter will also authorize the transfer of funds, as per telephone conversation, from the account of Repuestos de Tractores, C.A., a Venezuelan Co. which I control, to the account of Foster Construction, C.A. I believe there is a balance of about $15,000. in the above-mentioned account, in any event please transfer the total amount of this account. * * *On March 9, 1955 the bank transferred the balance in the Repuestos de Tractores account, which amounted to $21,999.60, to the Foster Construction, C.A. New York account. The aforementioned checks, payable to Craig Carroll Company, were issued for corporate purposes of Foster Construction, C.A., and did not represent withdrawals for the personal benefit of Grant Foster. Thomas J. Kelly check. In August 1954, Lady Hooper Schaefer, the sister of W. N. Hooper, purchased from American Industrial Sales Corporation*207 a promissory note dated June 29, 1954, in the amount of $60,000, which AIS had received from Basil Autry. AIS guaranteed the payment of the note. In November 1954, when W. N. Hooper sold his interests in AIS and the unpaid balance on the note amounted to $40,000, Grant Foster assumed the obligation of AIS, as guarantor. In 1956, Lady Hooper Schaefer filed suit against AIS to collect the unpaid balance due on the note and obtained a judgment. On August 16, 1956, check number D251453 in the amount of $44,406.05, signed by Grant Foster, payable to the order of Thomas J. Kelly (Sheriff of Dade County, Florida) was drawn on the New York account. The check was used to satisfy the judgment obtained by Lady Hooper Schaefer, and represented in substance the use of funds of Foster Construction, C.A., as part payment for stock of AIS which it had purchased from W. N. Hooper. Miscellaneous Items. The following checks, signed by Grant Foster, were drawn on the New York account: ItemCheck No.Date of CheckAmountPayee1D1007166/18/50$ 746.27M. J. Ericksen2D1007228/ 9/501,000.00C. R. Griffin3D1007238/ 9/502,686.57Ed Cloud4D10091012/ 5/50550.00Brown Bevis & Company5D1011184/30/5115,500.00Mass Electric, S.A.6D1012961/22/5210,000.00H. E. Roberts7D1777402/25/532,000.00A. J. Spiller8D1777413/ 4/533,022.50Bank of America9D1777554/10/535,000.00Grant Foster10D1777615/14/53758.00Michael Angino11D1779101/ 5/541,000.00C. R. Griffin12D1788095/31/555,481.94Curtiss National Bank13D2512291/25/56150.00Chester D. Erwin*208 Item 1 - M. J. Ericksen. In June 1950, M. J. Ericksen, who had been employed by the Caterpillar Tractor Company, was leaving Caracas and Foster bought some furniture from him. Check No. D100716 for $746.27 was drawn to pay for this furniture which was used in a house rented by Foster in Caracas and occupied by his family. When his family left Caracas the furniture was sold. This check represented a diversion of corporate funds for Foster's personal benefit. Items 2 and 11 - C. R. Griffin. C. R. Griffin was an employee of petitioner during the years 1947 and 1948 and during the portion of 1949 when Foster engaged in business as a sole proprietor, and an employee of Foster Construction, C.A. for several months in 1949. During this period Griffin worked long hours and received a salary of $400 per month. He was forced to leave Venezuela because of family problems. When Griffin left Venezuela Foster gave him the first of these two checks. It was issued for corporate purposes. Foster met Griffin in Miami on New Year's Day 1954. At that time, he felt he owed a debt of gratitude to Griffin for the services rendered by Griffin in Venezuela and, having the money available, issued to*209 him check no. D177910, dated January 5, 1954 for $1,000, as a gift. This check represented a withdrawal of corporate funds for Grant Foster's personal benefit. Item 3 - Ed Cloud. Ed Cloud was in charge of the Marine Department of the Creole Petroleum Corporation. Check No. D100723, dated August 9, 1950, in the amount of $2,686.57, was issued to pay Cloud for the cost of marine shipment of two tractors from Maracaibo to Cumarebo in Venezuela. This check was issued for corporate purposes. Item 4 - Brown Bevis & Co. C. R. Griffin ordered some shop equipment for Foster Construction, C.A. from Brown Bevis & Co. and check no. D100910, dated December 5, 1950, in the amount of $550, was issued to pay the invoice received from that company for that equipment. This check was issued for corporate purposes. Item 5 - Mass Electric, S. A. Foster received from Whiteside a bill dated March 22, 1951, addressed to "Foster Construction, S.A." for "Letal services rendered $15,500.00". Check No. D101118, dated April 30, 1951, payable to Mass Electric, S.A., signed by Foster, was drawn on the New York account, and Foster received the following receipt: April 30, 1951 Received of Grant Foster*210 $15,500 (Fifteen Thousand Five Hundred Dollars… Mass Electric S.A., /s/ Michael Angino Michael Angino was the "head" of Mass Electric S.A. and a personal friend of Foster and Whiteside. At the request of Whiteside the check for $15,500 was made payable to Mass Electric, S.A. This check represented a diversion of corporate funds for Foster's personal benefit. Item 6 - H. E. Roberts. Check No. D101296, dated January 22, 1952, in the amount of $10,000, was issued to H. E. Roberts. Prior to that date Roberts had been employed as a foreman by Foster Construction, C.A. He terminated his employment to go into the caterpillar tractor track repair business. Foster Construction, C.A. agreed to advance him $10,000 as a loan to purchase equipment and engage in this business in Venezuela with the understanding that he would render tractor repair service to Foster Construction, C.A. in repayment. Roberts did render some tractor track repair services for Foster Construction, C.A. This check was issued for corporate purposes. Item 7 - A. J. Spiller. Check No. D177740, dated February 25, 1953, payable to A. J. Spiller, was drawn by Foster on the New York account. Spiller was a pilot for*211 Shell Oil Company in Venezuela. This check was used to purchase a Jaguar automobile from Spiller. This automobile was used for business purposes by employees of Foster Construction, C.A. in Caracas, and occasionally by Foster when he was in Caracas. This check was issued for corporate purposes. Item 8 - Bank of America. Check No. D177741, dated March 4, 1953, in the amount of $3,022.50, was issued to the Bank of America. This check was issued for traveler's checks. Some of these checks were used for personal expenditures, and the remainder on company business. Onehalf of the amount withdrawn from the New York account was for Foster's personal benefit. Item 9 - Grant Foster. Check No. D177755, dated April 10, 1953, in the amount of $5,000 was drawn on the New York account, payable to Grant Foster. The record does not disclose that this check was issued other than for the personal benefit of Grant Foster. Item 10 - Michael Angino. Check No. D177761, dated May 14, 1953, in the amount of $758, payable to Michael Angino, was drawn by Foster on the New York account. In 1953, Mass Electric, S.A. was terminating its business in Venezuela and selling its equipment. Angino was associated*212 with this company, and this check was used to purchase an electric welder and an air compressor which Foster Construction, C.A. needed in its business. This check was issued for corporate purposes. Item 12 - Curtiss National Bank. On May 31, 1955, check no. D178809 in the amount of $5,481.94 was drawn on the New York account, payable to the Curtiss National Bank, which bank issued its check in the same amount to General Motors Corporation - Foreign Distributors Division. Consideration for the cashier's check was a 1955 Cadillac four-door sedan which was registered in the office of the Dade County Tax Collector on June 1, 1955, in the name of Foster Construction, C.A. On February 22, 1957, title to this car was registered in the name of the joint venture, Foster-Williams Brothers, at a purchase price of $4,000. This automobile was kept in Miami and was used by Grant Foster and Paul Cheesman and employees of American Industrial Sales Corp. and SALA. The check on the New York account was issued for corporate purposes. Item 13 - Chester D. Erwin. Check No. D251229, dated January 25, 1956, in the amount of $150, payable to Chester D. Erwin, was drawn by Foster on the New York account. *213 Erwin is a Miami certified public accountant who prepared the returns filed by petitioners for the years 1955 and 1956; the returns of Restof of Miami, Inc. for the years 1952 through 1956; and some time prior to 1955 worked for three or four months on the books of Tambor, Inc. The record does not disclose the nature of the accounting services rendered by him for which the $150 check was issued, for whom those services were rendered, or that it was issued other than for the personal benefit of Grant Foster. Rental income. In the year 1951, Grant Foster constructed a residential dwelling for his family at 405 Chambers Street, El Cajon, California. The cost of the dwelling was $18,624.67, and its useful life was 30 to 35 years. Title thereto was taken in the name of Grant and Barbara Dunn Foster. The cost of furnishings acquired for the house, amounting to $2,955.59, was paid by Barbara Dunn Foster about September 14, 1951. Mrs. Foster lived in this dwelling at times during the years 1951 through 1953. Thereafter, Paul Cheesman, Grant Foster's brother-in-law, at Foster's request, arranged the rental of such dwelling for Foster. During the years 1954 and 1955, this dwelling was rented*214 to two families, named Bray and Gallagher, by Cheesman, who collected the rent and managed the property. Near the end of 1955 or the beginning of 1956, Cheesman made an accounting to Foster of the rental income and the expenditures incurred on this property. No rental income from this property was reported by Foster on his Federal income tax returns for the years 1954 and 1955. The respondent determined that petitioners realized rental income for the years 1954 and 1955 in the following amounts: 19541955$908.68$1,009.42Interest income. Petitioners opened savings accounts numbers X7916 and X8639 at the Florida National Bank & Trust Company, Miami, Florida (the Florida Bank), on April 18, 1952, and March 23, 1953, respectively. Interest accruals were credited to petitioners' accounts by the Florida Bank during the years 1953 through 1956 in the following amounts: 1953195419551956Acct. 27916$101.44Acct. 28639225.21588.93594.83600.80Total$326.65$588.93$594.83$600.80Petitioners maintained savings account number XXXX at the Bank of America, La Jolla, California, for the period November 5, 1948, through*215 February 3, 1955. During the year 1951, interest accruals were credited to such account in the amount of $659.32. Although petitioners reported interest income from this source for the years 1953 and 1954, no income tax return reporting interest income from this source for the year 1951 was filed by petitioners. Grant Foster opened savings account XX9745 at the Whitney National Bank, New Orleans, Louisiana, in the year 1949. Over $15,000 was deposited by Foster in such account during the years 1949 through 1953. Such account was closed by Grant Foster in 1953, when the balance of $16,740.75, including interest accruals, was withdrawn by him. No interest income from this source was reported by Foster in income tax returns for the years 1951 or 1953. As already noted, Grant Foster advanced the amount of $14,638.45 to James W. Carson in December, 1951. From November 1952, forward, the parties treated $13,510.21 of this amount as a personal loan from Foster to Carson, and in 1956 this debt became worthless. In 1954, Foster received from Carson two checks, each in the amount of $350, for a total of $700, payable to Foster. In a letter to Foster dated October 6, 1954, Carson stated in*216 respect of one of these checks: "I am enclosing herewith check in the amount of $350.00 to apply on the indebtedness." In his notices of deficiency, respondent determined that petitioners realized unreported interest income in the following amounts: Source19511953195419551956Florida National Bank & Trust Co.$326.65$ 588.93$594.83$600.70Bank of America$659.32Whitney National Bank139.2388.32Carson Airplane Service700.00John Stadnik937.50390.00Totals$798.55$414.97$2,226.43$594.83$990.70Capital Gains - 1951. In his notice of deficiency for the year 1951, the respondent determined that Grant Foster realized capital gain on 410 shares of Investment Company of America; that such income was not reported; and that such gain was as follows: Total gain$229.60Less 50%144.80Taxable$114.80 In their reply to respondent's amended answer in Docket 84644 petitioners admit that they realized the foregoing capital gain in 1951. Returns of petitioners. In 1950 Foster became concerned about his liability for income taxes in the United States. He reached an agreement with Whiteside*217 that the latter would handle all of the tax returns of Foster and his wife in the United States. He gave Whiteside copies of Venezuelan tax returns which he had theretofore filed and discussed with Whiteside the various bank accounts from which he was authorized to make withdrawals and his salary arrangement with Foster Construction, C.A. Whiteside examined the corporation's charter and minute book, in which Foster and his wife were shown as owning 47 of its 50 shares, and told Foster that the book would have to reflect a sale of that stock. A stockholders' meeting was held and a sale of that stock was recorded in the minutes of that meeting. Otto Weber, a certified public accountant in active practice in Miami, and his accounting firm were used by Whiteside and his law firm in the preparation of tax returns of clients. In the month of October 1951, Federal income tax returns for Grant and Barbara Dunn Foster for the years 1947 through 1950 were prepared by Weber at the request of Whiteside upon the basis of information furnished him by Whiteside. Based on that information a sale by petitioners of 47 of 50 outstanding shares of the capital stock of Foster Construction, C.A. in 1950*218 was reported in their return for that year. Petitioners did not make any such sale. After he prepared the returns for the years 1947 through 1950, Weber sent them to Whiteside's office, and in October of 1951 Whiteside sent those returns to Mrs. Foster in El Cajon, California, for signature. On October 22, 1951, Whiteside addressed the following letter to Grant Foster in Venezuela: I have had your taxes for the years 1947, 1948 and 1949 computed from your individual tax returns filed in Venezuela. I have assumed that your last tax return in the United States was filed in California. Please advise whether or not this is true. If it is true, then we can, for the year 1947, take advantage of the community property laws of California, which entitle you to split your income between your wife and yourself for that year's taxes. For 1948 your Venezuelan individual return showed a net income taxable in the United States of $44,233.37. For this year alone your taxes are $13,443.98, with penalty for failure to file at 25% or $3,361.00 and interest from 6-15-49 to 11-15-51 or $1,949.38; which brings your total tax bill for that one year to $18,754.36. I am sending the tax returns to your*219 wife in California with the request that she execute same and return to me. Your total taxes, together with penalties and interest for the three years involved, will be $22,526.48. After your wife has executed the tax returns and returned them to me, I believe it necessary that we sit down and go over the matter in detail. For that purpose, please advise me if it is possible for you to come to the States in about two weeks from the date of this letter. If not, advise by cable and I shall make arrangements to meet you in Caracas. The returns of petitioners for the years 1947 through 1950 indicate that they signed these returns on October 31, 1951, and on that date Foster drew a check on the New York account, payable to Whiteside, in the amount of $22,526.48, 9 in payment of taxes, penalties and interest shown to be due for these years, computed up to November 15, 1951. This check was made payable to Whiteside because Whiteside suggested that it be done that way. The check was deposited in Whiteside's trust account. Whiteside did not at that time transmit the returns or make payment of the amounts shown due thereon to the Internal Revenue Service. In September 1951, Foster's wife*220 instituted divorce proceedings against him in the Circuit Court, Dade County, Florida. On September 30, 1953, in connection with these proceedings, a notice of Taking Deposition and to Produce Documents was served upon Foster and Whiteside. Among the documents Foster was required to produce were "all of his United States Federal or State or any foreign income tax returns or reports for the * * * years 1950, 1951, 1952 * * *. On October 3, 1953, Whiteside drew a check dated October 3, 1953, in the amount of $22,526.48 on the T. A. Whiteside Trust Account payable to the "District Director of Internal Revenue". Whiteside mailed the 1947, 1948, 1949 and 1950 returns of the petitioners together with the above check to the district director of internal revenue, Baltimore, Maryland, and they were received in that office on October 9, 1953. He also enclosed another check, in the amount of $1,928.18, which he characterized as representing "interest due from 11/15/51 to date." Weber also prepared an income tax return of petitioners for the year 1951 and turned the original over to Whiteside or his secretary. He received the*221 information used in the preparation of the return from Whiteside. The return, which was signed by petitioners and by Weber, as the person who prepared it, was not filed with the Internal Revenue Service. On October 30, 1953, the petitioners filed their individual joint Federal income tax returns for the year 1952 with the district director of internal revenue, Baltimore, Maryland. On September 24, 1954, the petitioners filed their individual joint Federal income tax returns for the year 1953 with the district director of internal revenue, Baltimore, Maryland. On August 9, 1955, petitioners filed their individual joint Federal income tax returns for the year 1954 with the district director of internal revenue, Baltimore, Maryland. The 1952, 1953 and 1954 returns were prepared by Weber. An income tax investigation of the tax returns of Grant Foster was commenced no later than July 16, 1957, and a meeting was held on or about that date in that connection in Miami which was attended by Cheesman, Charles D. Erwin, an accountant, and two agents of the Internal Revenue Service. Approximately one week prior to September 3, 1957, Foster asked Erwin to prepare petitioners' income tax returns*222 for the years 1955 and 1956, supplied him with information concerning the Stadnik loan, rents on American Industrial Sales properties, and dividend income from mutual funds, and told him to consult Cheesman and Whiteside if he needed additional information. Erwin prepared the 1955 and 1956 returns of petitioners, delivered them to Foster about October 10, 1957, and they were filed on October 14, 1957. For the years 1949 through 1956, with the exception of the year 1951, petitioners reported income for Federal income tax purposes as follows: 194919501952Net income, Foster Construction,$5,731.41individually owned businessTotal income from business5,731.41Less: Earned income limited by Sec.1,146.28116(a) to 20% of net profitsNet income$4,585.13Sale of StockSales price$10,000.00Cost8,000.00Profit$ 2,000.00$1,454.89Taxable capital gains1,000.00727.45Dividends1,643.45Interest804.56Rents: IncomeExpensesDepreciationNet - RentsAdjusted gross income$4,585.13$ 1,000.00$3,175.461953195419551956Net income, Foster Construction,individually owned businessTotal income from businessLess: Earned income limited by Sec.116(a) to 20% of net profitsNet incomeSale of StockSales priceCostProfit$ 753.85$3,246.78$16,077.86Taxable capital gains376.931,623.398,171.78Dividends2,329.222,470.86454.60Interest625.76638.34625.00Rents: Income8,465.00$8,580.00Expenses2,226.241,962.52Depreciation1,200.001,200.00Net - Rents$ 5,038.76$5,417.48Adjusted gross income$3,331.91$4,732.59$14,240.14$5,417.48*223 Waivers. For the years 1949, 1950, 1952 and 1954, petitioners and respondent executed Forms 872 "Consent Fixing Period of Limitations upon Assessment of Income and Profits Tax", extending the dates for the running of the statute of limitations on assessment for such years. The dates on which petitioners' returns for the taxable years were filed, the dates waivers were signed, the dates to which the running of the statute of limitations on assessment were extended by waivers, and the dates of mailing of deficiency notices, were as follows: DateDateExtendingDate of Mail-YearReturn FiledWaiver SignedStatute toing of Notice194910/ 9/533/24/586/30/596/30/59195010/ 9/533/24/586/30/596/30/591951No returnfiled8/31/59195210/30/533/24/586/30/596/30/5919539/24/548/31/5919548/ 9/553/24/586/30/598/ 4/60195510/14/578/ 4/60195610/14/578/ 4/60 The contents of the waivers and the circumstances in which they were given are set forth in the stipulation of facts and exhibits attached thereto, incorporated herein by reference. Salary - Grant Foster. In determining the deficiencies*224 for the year 1949 through 1953, respondent determined that Grant Foster was entitled as a resident of a foreign country to exclude from his gross income, under Section 116(a)(1) of the Internal Revenue Code of 1939, the salary which he received from Foster Construction, C.A. during those years, but that he was not entitled to such an exclusion under Section 911(a)(1) of the Internal Revenue Code of 1954, for the years 1954 through 1956. In his Amended Answers, respondent alleges that from September 1, 1952 through December 31, 1953, Foster was not entitled to the benefits of Section 116(a)(1) for such period. The salary of Grant Foster from Foster Construction, C.A. for each of the taxable years was as follows: 1949$ 18,656.251950124,951.15195175,132.811952108,330.461953101,941.861954104,162.711955104,161.87195699,995.64 This salary was reported (in Bolivars) in income tax returns for the years 1949 through 1956, filed by Grant Foster with the Government of Venezuela. Residence. When Grant Foster returned to Venezuela after the termination of his service in World War II, his wife and daughter accompanied him. *225 During the years 1946 to 1949 they lived at the construction sites in primitive conditions. In 1949, 1950 and 1951 Foster's family lived in quarters which he rented for them in Caracas, except for short periods when Mrs. Foster returned to the United States to give birth to a son in 1950 and to visit El Cajon, California in 1951. During the latter visit, she consulted a neurologist regarding their daughter, Jeanette, and was informed that she had cerebral palsy and Jeanette was left with Mrs. Hugh Foster, petitioner's mother, for special schooling. In March 1952, petitioner's wife and son returned to Venezuela and lived in a house trailer at a campsite in Punto Fijo. Petitioner and his wife wanted their children to attend American schools and at that time petitioner was planning to rent or purchase a house in Miami, which is only 5 1/2 hours flying time from Caracas, and to move his wife and children there. In about June 1952 Foster's mother advised him that she could not continue to care for Jeanette, and Mrs. Foster went to El Cajon where she stayed with the children until September 1952. She and the children then went to Coral Gables, Florida, where they stayed in rented quarters*226 for about two months. In the latter part of 1952, Foster and his wife had marital difficulties and she returned to El Cajon with the children and after about three months moved to Los Angeles where they resided until April 1954. During the year 1953 she and petitioner were living apart and their marital difficulties were not resolved until October of that year. At that time Foster spent a couple of days with her in Miami, and he went back to Venezuela and she returned to Los Angeles. They then planed that she would return to Los Angeles until school was out and would then return to Miami with the children. She and the children went to Miami in April 1954 and immediately moved into the Hibiscus house. Except for short periods when Mrs. Foster was away from Miami on trips, she and the children lived in that house until the middle of 1956. During the period September 1, 1952 to June, 1956, Foster made frequent trips to Miami, and, after the purchase of the Hibiscus Island house in the spring of 1953, he stayed at that house when he was in Miami. After each visit he returned to Venezuela, where Foster Construction, C.A. was engaged in several road construction projects, and lived in a*227 house trailer. His earned income during that period consisted of salary received from Foster Construction, C.A. for services rendered to it in Venezuela. His established status as a bona fide resident of Venezuela during the period January 1, 1949 to September 1, 1952 was not interrupted on the latter date and during the period September 1, 1952 to June, 1956, he continued to be a resident of Venezuela. In April, 1955, Foster caused a new corporation, Foster Construction, S.A., to be organized under the laws of Costa Rica. Foster Construction, S.A. and Williams Brothers Company of Tulsa, Oklahoma, formed a joint venture named Foster-Williams Brothers about June 1956. About such time the joint venture was awarded a contract by the Bureau of Public Roads of the United States Department of Commerce to participate in the construction of the Inter-American Highway in Costa Rica. In June 1956 Foster and his family moved to San Jose, Costa Rica. They resided in Costa Rica until about 1960. During the period January 1, 1949 to December 31, 1956, inclusive, Grant Foster was a bona fide resident of a foreign country. Books and records of Foster Construction, C.A. - false statements during*228 investigation. During the income tax investigation of Grant Foster for the years 1949 through 1956, the Internal Revenue Service sought unsuccessfully to obtain access to the Venezuelan books and records of Foster Construction, C.A. It encountered firm resistance to the production of such books and records and was denied access thereto throughout the investigation. On February 8, 1961, this Court issued a notice setting the instant cases for trial at Miami, Florida, on May 1, 1961. In April 1961 respondent served a subpoena duces tecum upon Grant Foster calling for the production of the books and records of Foster Construction, C.A. Such cases were continued from that trial calendar. In September 1964, prior to the trial of the instant cases, respondent again served a subpoena duces tecum upon Grant Foster calling for the production of the books and records of Foster Construction, C.A. and Foster Construction, S.A. Although some records were subsequently available, they were disorganized and incomplete, and no books of Foster Construction C.A. whatever were made available. Foster testified that he was informed that they were destroyed in 1962. In the latter part of July 1957 a special*229 agent of the Internal Revenue Service began an investigation of the Foster Construction, C.A. New York account by the the service of an administrative summons on the Bank of London - New York asking for the records of Grant Foster and of any corporation upon whose account Grant Foster had power to sign checks. About August 5, 1957, the special agent prepared to photostat the cancelled checks on these accounts, including the New York account of Foster Construction, C.A., which had been retained by the bank. However, he was told by the bank on August 6, 1957, that Foster had instructed it not to turn any of these records over to him. Foster and Foster Construction, C.A. intervened in the summons enforcement proceeding instituted against the Bank of London - New York by the United States. The case was heard in the United States District Court for the Southern District of New York, and its decision in favor of the United States was affirmed. In re Foster, 159 F. Supp. 444 (S.D.N.Y.), affirmed 265 F. 2d 183 (C.A. 2), certiorari denied, 360 U.S. 912. In that proceeding an affidavit filed in support of Foster's position made a representation that*230 Foster had "only a 3% stock interest in Foster Construction, C.A." That representation was known to Foster and it was not true. At a conference in February 1958 between representatives of the Internal Revenue Service on the one hand and Grant Foster and his representatives on the other hand, it was stated either by Grant Foster or one of his representatives that 65 percent of the stock of Foster Construction, C.A. was owned by Pedro Estrada, the former Chief of Secret Police in Venezuela. That representation was false, and Grant Foster shortly thereafter communicated with Estrada in an unsuccessful attempt to induce Estrada to furnish a false statement for submission to the Internal Revenue Service purporting to show that Estrada was a principal stockholder in Foster Construction, C.A. Indictment. On January 10, 1961, a four count indictment was returned by the Grand Jury to the United States District Court for the District of Maryland against Grant Foster, under Section 145(b) of the Internal Revenue Code of 1939 for the years 1952 and 1953, and under Section 7203 of the Internal Revenue Code of 1954, for the years 1955 and 1956. Counts one and two related*231 to the charge of wilful evasion of income taxes for the years 1952 and 1953, and counts three and four related to the charge of wilful failure to file income tax returns for the years 1955 and 1956. After a trial before a jury Foster was found "guilty" on counts one and two, and "not guilty" as to counts three and four. On Foster's appeal to the Court of Appeals for the Fourth Circuit ( United States v. Foster, 309 F. 2d 8) that court held that the judge of the district court erred in admitting proof of Foster's lawful resistance to the production of records to establish consciousness of guilt and in charging the jury to draw an inference of "misdoing" if it found that Foster did in fact impede the Internal Reenue Service in its investigation, and the District Court's judgment and the convictions for 1952 and 1953 were reversed. On remand, Grant Foster entered a plea of "nolo contendere", and such plea was accepted by the United States District Court for the District of Maryland on November 8, 1963. Its judgment, dated November 8, 1963, provided in part as follows: * * * the defendant has been convicted upon his plea of "nolo contendere" * * * of Income Tax Evasion, *232 as charged, and the Court having asked the defendant whether he has anything to say why judgment should not be pronounced, and no sufficient cause to the contrary being shown or appearing to the Court, IT IS ADJUDGED that the defendant pay a fine of Ten Thousand Dollars ($10,000.00), and that imposition of sentence, as to imprisonment be suspended, and defendant placed on Probation for a period of five (5) years, as to Count No. 1; that the defendant pay a fine of Ten Thousand Dollars ($10,000.00), and that imposition of sentence, as to imprisonment, be suspended, and defendant placed on Probation for a period of five (5) years, as to Count No. 2; said fines imposed as to each * * * Count * * * to be cumulative, making a total fine of Twenty Thousand Dollars ($20,000.00), and said periods of Probation to be concurrent, making a total period of five (5) years Probation * * * The returns filed by petitioners for each of the years 1949, 1952, 1953 and 1955 were false and fraudulent with intent to evade tax. Part of the deficiency in tax for each of the years 1949, 1951, 1952, 1953 and 1955 was due to fraud with intent to evade tax. Opinion RAUM, Judge: The principal question*233 for decision relates to the amounts includable in petitioners' gross income for each of the years 1949-1956 as a result of withdrawals made by Grant Foster from the account of Foster Construction, C.A., in the Bank of London & South America, Ltd., New York agency. Foster Construction, C.A. was a Venezuelan corporation in which Grant Foster was the dominant stockholder. It was in the construction business in Venezuela and was the successor to a sole proprietorship which Grant Foster had operated until its incorporation in 1949. From time to time large amounts of corporate funds were transferred from Venezuela to the foregoing account in the name of the corporation in New York. Grant Foster was the only person who drew upon that account, and during the period August 2, 1949, when the account was opened, until the end of 1956, he drew some 1,109 checks upon it. In the determinations of deficiency and pleadings, the Commissioner took the position that a considerable number of those withdrawals, identified by date and amount, were made by Grant Foster for his personal benefit and represented income to him. At the trial the parties filed a stipulation of facts in which certain of the checks*234 thus charged to Foster by the Commissioner were conceded by the petitioners to be "personal" and others were conceded by the Commissioner to be "corporate". The trial was concerned to a considerable extent with the efforts of the parties to classify the remaining checks in dispute either as having been drawn for Foster's personal use or for the benefit of the corporation. The issue is predominantly one of fact, and in our findings we have attempted to resolve it as to each of these checks; 10 we shall not undertake to deal comprehensively with them in this opinion, although we shall comment on some factors that we took into account in making our findings. Moreover, intertwined with this basic issue were problems involving burden of proof and fraud, and closely related thereto was the issue of residence of Grant Foster which has an important bearing upon the amount of unreported income that may properly be charged to petitioners. These matters, as well as certain other issues in the case, call for discussion. General. In 1946 petitioner*235 Grant Foster, operating as a sole proprietor under the name of Foster Construction, was engaged in the business of highway construction and related work for the Government of Venzuela as well as for certain oil companies. The business enjoyed a modest prosperity. In early 1949 petitioner was approached in behalf of three high officials in the Ministry of Public Works, who outlined a program of highway expansion that was to take place in Venezuela and who proposed a scheme whereby Foster's company would receive advance information on road contracts and construction projects, special consideration in the award of these contracts, leniency in inspections of work performed, and prompt issuance of progress payments for work performed. Foster was to be entitled to withdraw $100,000 a year from the business as salary, and each of the three officials was to receive secret payments in cash up to $100,000 a year if the earnings of the business were sufficient. Foster agreed to this corrupt plan and in conjunction therewith he had the business incorporated under the name of Foster Construction, C.A. On August 2, 1949, he caused to be transferred to an account then opened in the corporation's*236 name at the Bank of London & South America, Ltd., New York agency, the balance in an account which theretofore had been in his own name at the New York branch of the same bank. Following Foster's association with the three officials, his construction business began to earn spectacular profits. He personally made the cash payments or bribes to them in Venezuela from time to time, and also large amounts were siphoned out of the corporation's account at the Caracas branch of the Bank of London & South America, Ltd., in Venezuela and deposited in the New York account. Only Foster and his wife had authority to draw upon the latter account, but in practice he was the only person who ever signed checks on this account during the tax years, 1949-1956. Foster testified that upon incorporation of the business in 1949 he and the three Venezuelan officials each became the owner of 25 percent of the stock. We did not believe that testimony. We did not have much confidence in Foster's credibility. From our observation of him as a witness and our appraisal of his testimony in general, he appeared to us to be all too ready to bend the facts to accord with what he thought to be to his best advantage. *237 Regardless of his arrangement with those three officials, which appears to involve merely a four-way split of the first $400,000 of profits annually from contracts with the Government of Venezuela, with the first $100,000 going to Foster, it was clear to us that the three Venezuelans were not stockholders of any consequence in the corporation. We were fully satisfied on the entire record that Foster was the true owner of the great bulk of all the outstanding shares of Foster Construction, C.A. at all times relevant herein. This was an important conclusion, because it threw much light upon Foster's control and use of the New York account. Foster treated the corporation as his own and used the New York account indiscriminately for the benefit of the corporation as well as for his own personal purposes. Concessions by the Government reveal a number of expenditures from that account in behalf of the corporation, such as purchases of equipment or salaries of American employees; and concessions by petitioners disclose a wide range of personal items entirely unrelated to the business of the corporation. Among the disputed items were withdrawals of substantial sums from the New York account*238 that were used by Foster for certain investments or purchases of various items of property in the United States either outright or through other corporations controlled by him. And in some instances when such investments or purchases were liquidated the amounts realized were deposited back in the New York account. Petitioners rely upon such redeposits as evidence that the original withdrawals from the New York account in respect of those items were for the benefit of the corporation and represented corporate investments rather than diversions of corporate funds for Foster's personal benefit. However, the matter is not that simple. The so-called redeposits after Foster learned of the commencement of the tax investigation in the summer of 1957 have very little probative value. Cf. Atlanta Biltmore Hotel Corp. v. Commissioner, 349 F. 2d 677, (C.A. 5, July 23, 1965). On the other hand, such redeposits made prior thereto are entitled to much greater weight. Of course, the mere fact that any such redeposit was made prior to 1957 is not conclusive, for Foster regarded the corporation as his own and it would have been quite natural for him to deposit in its account the proceeds*239 of liquidation of some personal investment if he thought that his corporation needed the cash. In making our findings we took into account all the evidence of record and attempted to determine upon the basis of all the materials before us whether or not a particular withdrawal was personal to Foster, giving appropriate but not conclusive effect to the fact that there may have been a redeposit in connection with that item. Another aspect of the case is that, in our judgment, some but not many of the disputed checks, particularly those drawn to cash, were for both personal and corporate purposes. An allocation was therefore necessary, and our findings in those instances reflect such an allocation, following Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2). A further matter calling for comment relates to whether it was necessary to show that Foster Construction, C.A. had earnings and profits as a condition precedent to the taxability of any diversions for Foster's personal benefit. The point was raised by petitioners in their pleadings, but was not dealt with in their otherwise comprehensive briefs and we therefore conclude that it has been abandoned by them. Moreover, wholly*240 apart from the question whether the existence of corporate earnings and profits is a condition of taxability, cf. Davis v. United States, 226 F. 2d 331, 334-335 (C.A. 6), we are satisfied on the record before us that Foster Construction, C.A. was shown to be highly prosperous, that it had very substantial earnings sufficient to support at least the greater portion of the distributions for each year, and that petitioners have wholly failed to show that the amounts of corporate earnings and profits were insufficient to support such distributions in their entirety. Cf. DiZenzo v. Commissioner, 348 F. 2d 122, (C.A. 2, June 28, 1965). Residence and salary. An individual citizen of the United States, who has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, may under the provisions of Sections 116 and 911 of the Internal Revenue Code of 1939 and the Internal Revenue Code of 1954, respectively, exclude from his gross income amounts received from sources without the United States which constitute "earned income." In those sections the term "earned income" is defined to mean "wages, salaries, *241 professional fees, and other amounts received as compensation for personal services actually rendered * * *". The applicable Treasury Regulations provide in part: What constitutes bona fide residence. Though the period of bona fide foreign residence must be continuous and uninterrupted, once bona fide residence in a foreign country or countries has been established, temporary visits to the United States or elsewhere on vacation or business trips will not necessarily deprive the citizen of his status as a bona fide resident of a foreign country. * * * Regulations 118, Section 39.116-1(a)(2); Regulations under the Internal Revenue Code of 1954 Section 1.911-1(a)(2). As noted in our findings, the Commissioner, in the notices of deficiencies for the taxable years, determined that petitioners were entitled to exclusions for Grant Foster's salary from Foster Construction, C.A. for the years 1949 through 1953, but that they were not entitled to exclusions for his salary from that corporation for the years 1954, 1955 and 1956. In amended answers the Commissioner affirmatively alleged that Grant Foster was not a resident of a foreign country during the period*242 September 1, 1952 to December 31, 1953, and was not entitled to have his salary for that period excluded from gross income. The burden of proof in respect of this issue was thus upon the Government for the period September 1, 1952 to December 31, 1953, but was upon the petitioners for the years 1954-1956. After considering all the evidence and bearing in mind the respective burdens of proof we have found as a fact that Grant Foster was a bona fide resident of a foreign country during the entire period in dispute. The record clearly establishes that Foster became a resident of Venezuela in 1939, and, after a brief period of military service during World War II in the United States, resumed his Venezuelan residence in late 1945 or early 1946. The Government does not question his foreign residence up to September 1952, but argues that beginning at that time Foster became so identified with Miami, Florida, as to lose his Venezuelan residence. We received a considerable amount of evidence on this issue, and the matter may not be completely free from doubt. Nevertheless, taking into account the dominant fact that Foster continued to be the moving spirit and chief executive of his construction*243 company in Venezuela and that he continued to spend very substantial amounts of time in Venezuela, we think that neither the fact that he established a home for his wife in the United States in the special circumstances shown nor other evidence of record was sufficient to justify the conclusion that his foreign residence had been interrupted during the tax years. He was a bona fide resident of Venezuela during the tax years until mid-1956, when he and his family moved to Costa Rica where they then became and remained bona fide residents for at least several years thereafter. Plainly, therefore, Grant Foster's salary was excludable from gross income for each of the years in controversy. And the parties have in effect stipulated that the amounts of Foster's withdrawals from the New York account for his own benefit in any year may be applied against his salary "for such year and/or his unpaid salary for prior years". The amount of his salary for each year has also been stipulated, and accordingly, to the extent thereof, the personal withdrawals from the New York account do not constitute taxable income. However, a so-called carry-over problem arises in respect of the years 1950 and*244 1954. In each of those years, the salary exceeded the amount of the personal withdrawals as ultimately found by us, and petitioners insist that the excess must be treated as unpaid salary and carried over to the respective following years. We think there is no merit to that position. Grant Foster's salary, which the parties stipulated for the years 1949-1956, was equal to the amounts reported by him in his individual income tax returns filed with the Government of Venezuela as "Salary or other Remunerations" received from Foster Construction, C.A. The corporation had substantial resources in Venezuela out of which any deficiency in salary could have been paid, and we think it highly improbable that Foster would have reported and paid taxes in Venezuela upon income that he had not in fact received. We are satisfied on this record that there was thus in fact no unpaid salary or arrearage as of the end of any year and that there is therefore no carry-over to any following year. Statute of Limitations. Petitioners have alleged that assessment of deficiencies is barred as to the years 1949, 1950, 1952, 1953, and 1954 because the period of limitations had expired as to those years when*245 the deficiency notices were mailed. No such issue is presented as to 1951, since no return had been filed for that year, and no such issue is presented as to 1955 and 1956 since the deficiency notices were mailed within the permissible statutory period after the petitioners delinquent filing of returns for those two years. Moreover, the issue as to 1950 becomes moot in view of the fact that there is no deficiency for that year, since, as a result of our findings, the amount of Foster's personal withdrawals from the New York account was fully absorbed by and allocated to his nontaxable foreign salary. Concededly, the deficiency notices as to 1949, 1952, 1953 and 1954 were sent too late, unless there was fraud or unless there was some other valid reason for holding that the bar of the statute of limitations had been lifted. The Government contends that the notices were timely not only because the returns were false and fraudulent with intent to evade tax (Sec. 276(a), I.R.C. 1939; Sec. 6501(c)(1), I.R.C. 1954), but also because there was an omission of more than 25 percent of gross income in each of the returns. 11*246 The burden of proof in these respects was, of course, upon the Government. We have found fraud for each of the years presently under consideration except 1954, and that finding alone lifts the bar of the statute of limitations for 1949, 1952, and 1953. The matter of fraud will be discussed hereinafter. Computations based upon our findings also establish that there was an omission of more than 25 percent of gross income in all of the years 1949, 1952, 1953 and 1954. We shall comment at present only upon 1954 which otherwise would have been barred. In 1954, as in 1950, Foster's personal withdrawals from the New York account were allocable in full to his tax-free foreign salary and were therefore not includable in gross income. In determining petitioners' 1954 deficiency, however, the Commissioner also charged them with unreported interest income in the amount of $2,226.43 and unreported rental income in the amount of $908.68. Although the evidence is not sufficient to establish that omissions of interest and rental income were due to fraud, the evidence nevertheless does convincingly establish at the very least that petitioners received unreported income in these categories that*247 was more than 25 percent of their reported gross income. Their 1954 return disclosed gross income in the amount of $4,732.59, whereas their unreported interest from the Florida National Bank & Trust Co. of $588.93 and from John Stadnik of $937.50, or a total of $1,526.43, was comfortably in excess of 25 percent of their reported gross income. Accordingly, wholly apart from the other items of interest or rentals which the Commissioner allocated to petitioners for that year, the foregoing unreported items were convincingly shown to have been income that should have been included in petitioner's 1954 return. The deficiency notice for 1954 was therefore timely. Fraud. Petitioners contend that respondent has not sustained his burden of proving fraud for any of the taxable years by clear and convincing evidence. They urge that Foster, who had not finished high school, had had no occasion to become familiar with the tax laws of the United States; that it was not until 1950 that he became aware that he might owe some taxes to the United States; that he then retained Whiteside as his attorney and tax adviser and relied upon him to prepare and file correct returns for himself and his wife; *248 and that Whiteside was responsible for their United States returns. Grant Foster during the taxable years 1949 through 1956 was the president, general manager, and dominant stockholder of Foster Construction, C.A. and controlled that corporation's bank accounts in Venezuela and New York. During each of those years he made substantial withdrawals from the New York account. In each year, with the exception of 1950, 1954 and 1956, the amounts withdrawn for his personal use were substantially in excess of his salary from Foster Construction, C.A. that was excludable from his gross income because of his residence in a foreign country. Foster was aware of this because he personally kept a book in which he recorded all deposits and withdrawals from the New York account during the years 1949 through 1956. He testified that in 1950, it became apparent to him that "he might be in a tax situation as far as the United States was concerned"; that he then employed Whiteside, a Miami attorney, to handle United States returns for himself and his wife; and that he gave Whiteside copies of individual and corporate returns he had filed in Venezuela subsequent to the formation of Foster Construction, *249 C.A. in 1949, and discussed with Whiteside various bank accounts from which he was authorized to make withdrawals and his salary arrangement with Foster Construction, C.A. We are satisfied that at least after his discussion with Whiteside and prior to the execution of the returns, Foster was fully aware that his income other than foreign salary was subject to tax in this country. Based upon information received from Whiteside, an accountant, employed by Whiteside, prepared returns for petitioners for the years 1949 through 1954, all of which were signed by petitioners. The 1951 return was not filed. In 1957, after Foster and Whiteside had severed relations, another accountant prepared petitioners' returns for 1955 and 1956, which were based upon information received by him from Foster. The income reported by petitioners in all of the returns filed for the taxable years, and the income shown on the 1951 return which was prepared and signed by petitioners but not filed, consisted of comparatively small amounts of capital gains, dividends, interest and rents. No mention was made in any of these returns of the substantial amounts Foster had diverted to his personal use from the New*250 York account. The 1949 income tax return of petitioners contains the following statement: After the liquidation of the taxpayers individually owned business as of April 30, 1949, he was employed on a salary basis by Foster Construction, C.A. a corporation in which the taxpayer was a minority stockholder. Since this salary represented earned income, no part of it is taxable within the United States. This statement was false. In 1949 Grant Foster was the true owner of at least 47 of the 50 shares of stock of Foster Construction, C.A. Twenty-two of those shares were in the name of his wife, Barbara Dunn Foster, who had made no contribution to the capital of the corporation or paid any amount for shares of its stock. He certainly was not a "minority stockholder". In the 1950 return of petitioners a capital gain of $2,000 was reported from the sale of 47 shares of stock of Foster Construction, C.A. No such sale was made. Although this fictitious sale was reported at Whiteside's suggestion, Foster knew that such a sale had not been made at the time he signed the 1950 return. The apparent purpose of the statement in the 1949 return and the false reporting of the sale of the 47 shares*251 in the 1950 return (without indicating that 47 shares constituted 94 percent of the stock of the corporation) was to create the impression that Foster was only a salaried employee of a foreign corporation and, being a resident of a foreign country, the income received from that corporation represented salary or earned income which was excludable from gross income in his United States income tax returns. The evidence discloses further instances in which he endeavored to conceal his true interest in the equity of the corporation, including an attempt to induce Pedro Estrada, the former Venezuelan Chief of Secret Police, to furnish a false statement for submission to the Internal Revenue Service purporting to show that Estrada was a principal stockholder of the corporation. And we also found beyond belief Foster's misleading testimony before us that he and three other Venezuelan officials each owned 25 percent of the stock. We are not impressed by counsel's attempt to picture Foster as a man of only limited education who was unfamiliar with the tax laws of the United States and therefore had to rely, and did rely, upon Whiteside, his attorney, to prepare returns showing the correct*252 amount of his income. The fact that Foster had only a limited formal education did not hinder or impede his rapid rise to success. By virtue of his business acumen and his crafty alliance with corrupt high Government officials in Venezuela he became highly prosperous during the period that he was the chief executive and in full control of Foster Construction, C.A. and its bank accounts. Our observation of him while he was testifying, and our examination of all evidence relating to his activities, convince us that he was a shrewd, calculating, and intelligent person. As already noted, he knew that substantial amounts had been withdrawn by him from the New York account of Foster Construction, C.A. for his personal use and, except for 1950, 1954 and 1956, we think it incredible that he was unaware that such withdrawals were substantially in excess of his tax-free foreign salary, or that such excess represented reportable and taxable income. Moreover, during the course of the investigation of his returns he was wholly uncooperative and displayed an attitude of rigid and uncompromising determination to prevent the Government from learning about the details of his corporation's financial*253 affairs that might throw light upon his own income. Although we have been careful, out of an abundance of caution, not to take into account such evidence to the extent that it involved his "lawful resistance to investigation", as was considered in United States v. Foster, 309 F. 2d 8 (C.A. 4), there nevertheless remains a hard core of evidence admissible even under that decision tending to show efforts at concealment that may properly be weighed in determining fraud. Petitioners attempt to place the responsibility upon Whiteside for the omissions from their returns of amounts diverted by Foster to his personal use in excess of excludable salary and thus absolve Foster of any fraudulent intent to evade tax by reason of those omissions. They quote from Davis v. Commissioner, 184 F. 2d 86 (C.A. 10) where the court said (p. 88): "To hold a taxpayer guilty of fraud, who without actual knowledge that a return is false, and after a full disclosure to the expert preparing the same, would be untenable." We do not disagree with this statement. However, we have searched the record in vain for evidence showing that Foster supplied Whiteside, who handled the preparation*254 and filing of petitioners' returns for the taxable years 1949 through 1954, and the accountant, who handled their returns for the years 1955 and 1956, after Foster and Whiteside had severed relations, with all the information needed by them to file correct returns. Foster testified that in 1950, when he employed Whiteside to prepare returns of petitioners for the years 1947 through 1950, he gave Whiteside copies of individual and corporate returns he had filed in Venezuela and discussed with Whiteside various bank accounts from which he was authorized to make withdrawals and his salary arrangement with Foster Construction, C.A. He did not testify that he informed Whiteside of the amounts diverted to his personal use from the New York account. He did not testify that "Whiteside made his own personal investigation of the Bank of London accounts", a statement made by petitioners on brief which is not supported by the record page references given therefor. The evidence does not disclose that Foster ever gave Whiteside information concerning all of the diversions he was making to his personal use from the New York account or that Whiteside made any examination of that account which would*255 permit Whiteside to prepare correct returns of his income reflecting the taxable effect of those diversions. Moreover, even if Whiteside had masterminded the fraudulent returns, we are satisfied that Foster was no mere innocent beneficiary thereof and that he knowingly attempted to accept the benefits of such returns. Whiteside did not handle petitioners' returns for the years 1955 and 1956. The accountant employed by Foster to handle the preparation of those returns testified that Foster supplied him with information concerning the Stadnik loan, rents on American Industrial Sales properties and dividend income from mutual funds, and told him to consult Cheesman and Whiteside if he needed additional information. His testimony discloses that he received no information from Foster or anyone else concerning the diversions made by Foster from the New York account to his personal use during 1955 and 1956. The evidence clearly and convincingly discloses that Foster bears the responsibility for the omission of the diverted funds from the gross income reported in the returns filed by petitioners for the years 1949, 1952, 1953 and 1955. He signed those returns, and the 1951 return which*256 was prepared but not filed, knowing that no mention was made of the amounts diverted to his personal use from that account in excess of his nontaxable salary. The gap between the taxable amounts which the evidence shows were clearly so diverted and the insignificant amounts of gross income in the returns is too substantial to have been overlooked by Foster when he signed the returns. From our consideration of this and other evidence contained in the record, we have reached the conclusion, and found as a fact, that part of the deficiencies in tax for each of the years 1949, 1951, 1952, 1953 and 1955 was due to fraud with intent to evade tax, and that the returns filed by petitioners for the years 1949, 1952, 1953 and 1955 were false and fraudulent with intent to evade tax. Burden of proof. The burden of proving fraud was, of course, upon the Government, and it was required to carry that burden with clear and convincing evidence. On the other hand, the burden of proof in respect of the basic deficiencies determined in the Commissioner's notice of deficiency rested upon the petitioners. These are two separate burdens and must be distinctly kept in mind. Indeed, it is even possible*257 that both sides may fail in their respective burdens. Cf. Drieborg v. Commissioner, 225 F. 2d 216 (C.A. 6). Thus, the mere fact that the taxpayer may fail to carry his burden of proof does not relieve the Government of its obligation to establish fraud, and to the extent that unreported income is one of the ingredients of fraud, the Government must carry its burden in that respect. Drieborg v. Commissioner, supra, at p. 218. We have been careful to be guided by these considerations in making our findings of fraud. For, we took into account only those withdrawals from the New York account in excess of Foster's salary that were either conceded or established by clear and convincing evidence to be personal in making our findings as to fraud; and only after we had concluded that fraud had been properly proved so as to lift the bar of the statute of limitations did we give effect to petitioners' failure to carry their burden of proof in respect of any other withdrawals from the New York account that we may have ultimately classified as personal. Thus, in making our finding of fraud we were satisfied that there was clear and convincing evidence showing substantial*258 amounts of unreported taxable income attributable to personal withdrawals from the New York account prior to classifying as personal any other withdrawals by reason of petitioners' failure to carry their burden of proof. As to the basic deficiencies, petitioners have made the contention that as a result of concessions made by the Government in respect of various withdrawals from the New York account, the presumption of correctness of the Commissioner's determination in respect of the remaining withdrawals has been destroyed, with the result that, even as to the basic deficiencies, the burden is upon the Government to show affirmatively that all withdrawals (not conceded by either party) represented diversions of corporate funds for Foster's personal benefit. We hold otherwise. There has been no such shifting of burden of proof. The situation is a familiar one. Either by concession or by proof at the trial itself a portion of the deficiency may be shown to be in error; but that circumstance does not shift the burden of proof in respect of the remaining items or the remaining portion of the deficiency. Substantially the same contention was considered and rejected in William O'Dwyer, 28 T.C. 698,*259 affirmed 266 F. 2d 575 (C.A. 4), certiorari denied, 361 U.S. 862, where we said (28 T.C. at 705): In determining the deficiency for the year 1951, the respondent made several adjustments, one of which was to add $15,656.48 to the net income reported by petitioners for that year on the ground that it had been understated in this amount. Prior to the trial respondent became satisfied that $14,156.48 of this amount did not represent taxable income, and he conceded that to that extent there was no understatement. This left in issue the amount of $1,500, representing the unexplained bank deposit. The petitioners contend that the respondent's concession of the major portion of the adjustment destroyed any presumption that his determination was correct insofar as the $1,500, not conceded, was concerned. We do not agree. The presumption of correctness of the respondent's determination that the $1,500 was taxable income continued to exist after the concession, just as it would have continued to exist if petitioners had proved at the trial that the $14,156.48 was not taxable to them, and had left unproved the remaining $1,500. * * * Similarly, the general*260 rule was stated as follows in M. Pauline Casey, 38 T.C. 357, 377-378: Petitioners argue that any presumption of correctness attached to respondent's determinations vanished since certain items have been proved or conceded to be inaccurate. We cannot agree. It has long been recognized that where error has been shown by the taxpayer which does not affect the entire deficiency, but only a separable part thereof, the presumption of correctness remains with respect to the other items composing the deficiency, and petitioner still bears the burden of proof of error with respect to such other items. Hoffman v. Commissioner, 298 F. 2d 784 (C.A. 3, 1962), affirming on this point a Memorandum Opinion of this Court. * * * Cf. also Charles Oran Mensik, 37 T.C. 703, 724-725, affirmed 328 F. 2d 147 (C.A. 7), certiorari denied, 279 U.S. 827; Fada Gobins, 18 T.C. 1159, 1168-1169, affirmed per curiam 217 F. 2d 952 (C.A. 9); Anderson v. Commissioner, 250 F. 2d 242, 246 (C.A. 5); Clark v. Commissioner, 266 F. 2d 698, 707 (C.A. 9); Commissioner v. Smith, 285 F. 2d 91, 95*261 (C.A. 5); Hoffman v. Commissioner, 298 F. 2d 784, 788 (C.A. 3); Banks v. Commissioner, 322 F. 2d 530, 548 (C.A. 8). Petitioners' reliance upon Weir v. Commissioner, 283 F. 2d 675 (C.A. 6), does not require a contrary result. The opinion in that case did not indicate that it represented a departure from the general rule reflected in the foregoing cases, and it must be deemed to rest upon its special facts including the taxpayer's clear and uncontradicted testimony that he had never received any personal benefit from the checks in question. The record in the present case contains no such credible evidence. Rental income. During the years 1954 and 1955, Cheesman rented for petitioners a dwelling owned by them in El Cajon, California. Respondent determined that petitioners realized unreported rental income from this dwelling of $908.68 in 1954 and $1,009.42 in 1955, and in determining the deficiencies for those years added these amounts to the gross income reported in petitioners' returns. Petitioners urge that respondent's determination was erroneous because he failed to take into consideration depreciation allowable on the house and furniture. *262 Petitioners had the burden of proving that respondent erred in these respects. In order to sustain that burden they had to prove that the amounts respondent added to their gross income for rent represented the gross rentals received in each year and not the net rentals after making allowances for depreciation. No such proof was produced by them. In the circumstances the respondent's determination must be, and is, approved. Interest income. In his notices of deficiency, respondent determined that petitioners realized unreported interest income in the following amounts: Source19511953195419551956Florida National Bank & Trust Co.$326.65$588.93$594.83$600.70Bank of America$659.32Whitney National Bank139.2388.32Carson Airplane Service700.00John Stadnik937.50390.00 Petitioners have not produced any evidence showing error in respondent's determinations with respect to interest received from the Florida National Bank & Trust Co., Bank of America, and Whitney National Bank, and do not appear to contest those determinations. We hold, therefore, that respondent did not err as to these items. Petitioners do contest*263 respondent's determination that Foster received interest in the amount of $700 from Carson Airplane Service in 1954 on the ground that the "treatment of this check has been stipulated." The parties have stipulated that subsequent to November 1952, there was a net balance due on a personal loan from Foster to Carson of $13,510.21; that in addition thereto Carson drew two checks payable to Foster, each in the amount of $350 in the year 1954; and that respondent concedes that the loan became a bad debt in the year 1956 in the amount of $13,510.21. The stipulation does not clearly disclose the purpose for which the two $350 payments were made in 1954. In view of the fact that the debt of $13,510.21 was not increased or decreased between November 1952 and 1956 when it became worthless we think it is reasonable to assume that those payments did not represent payments of principal on that debt. The record in respect of the two $350 payments is too murky to justify a conclusion that they did not represent interest, and we therefore hold for the Government in respect of this item for failure of proof. Petitioners contend that respondent erred in his determination that interest on the Stadnik*264 loan in the amount of $937.50 for 1954 and $390 for 1956 was includable in their taxable income for those years. The Stadnik loan was a personal loan made by Foster with funds diverted from the New York account. He received the benefit of the payments of principal and interest made by Stadnik on that loan regardless of whether they were made by checks issued by Stadnik to "T. A. Whiteside, Trustee", "Tambor Acct. and for T. A. Whiteside", "T. A. Whiteside" or "Grant Foster". The taxation of the interest is not controlled by the manner in which Whiteside chose to treat the loan transaction on any books maintained by him or by the fact that in some years he may have reported it in returns filed for the Grant Foster Trust. The interest received was income of Foster which should have been reported in the returns of petitioners and respondent did not err in his determination that the interest paid by Stadnik in the amounts of $927.50 in 1954 and $390 in 1956 was includable in petitioners' taxable income for those years. Additions to tax for failure to file timely returns. In his notices of deficiency, respondent determined that the petitioners are liable for additions to tax under*265 Section 291(a) of the Internal Revenue Code of 1939 for failure to timely file their Federal income tax returns for the years 1949 through 1953. That section provides, in part, as follows: In the case of any failure to make and file returns required by this Chapter, within the time prescribed by law or prescribed by the Commissioner in pursuance of law, unless it is shown that such failure is due to reasonable cause and not due to wilful neglect, there shall be added to the tax: 5 per centum if the failure is for not more than thirty days with an additional 5 per centum for each additional thirty days or fraction thereof during which such failure continues, not exceeding 25 per centum in the aggregate. The parties have stipulated that there is no record of an individual income tax return being filed by Grant Foster for the year 1951. They have also stipulated the dates of filing of petitioners' returns for the years 1949, 1950, 1952 and 1953. The dates of filing, as stipulated, and the due dates (Section 53 of the Internal Revenue Code of 1939) are as follows: YearDate of filingDue date1949October 9, 1953March 15, 19501950October 9, 1953March 15, 19511951No recordMarch 15, 19521952October 30, 1953March 15, 19531953September 24, 1954March 15, 1954*266 As to 1949, the record shows that petitioners executed their return and it was transmitted to Whiteside for filing in late October 1951. Whiteside did not in fact file the return until October 1953. If the delay between October 1951 and October 1953 were crucial we would be prepared to find that it was due to Whiteside and that petitioners had shown the requisite reasonable cause. But that delay is not of any importance here, since the return was already hopelessly delinquent when petitioners transmitted it to Whiteside in 1951, and they have not shown that their failure to file a return even as late as then was due to reasonable cause and not to wilful neglect pursuant to Section 291(a). 12 The record also fails to show that failure to file timely returns for the years 1951, 1952 and 1953 was due to reasonable cause and not to wilful neglect. The Commissioner therefore did not err in determining that the addition to tax called for by Section 291(a) is applicable to the years 1949, 1951, 1952, and 1953. The situation in respect of 1950 is different since the*267 assessment of any deficiency for that year is barred, and the Section 291(a) addition to tax may not therefore be imposed. Additions to tax for failure to file declarations of estimated tax. For the years 1949 through 1954, respondent determined that petitioners are liable for additions to tax for failure to file declarations of estimated tax under Section 294(d)(1)(A) of the 1939 Code, which provides, in part, as follows: In the case of a failure to make and file a declaration of estimated tax within the time prescribed, unless such failure is shown to the satisfaction of the Commissioner to be due to reasonable cause and not to wilful neglect, there shall be added to the tax 5 per centum of each installment due but unpaid * * * For the purposes of this subparagraph the amount and due date of each installment shall be the same as if a declaration had been filed within the time prescribed showing an estimated tax equal to the correct tax reduced by the credits under sections 32 and 35. Section 294(d)(1)(A) applies to the taxable year 1954, as well as the years 1949 through 1953. Regs. Sec. 1.6654-4, under the 1954 Code. Petitioners have not shown that declarations of estimated*268 tax were filed for the years 1949 through 1954, or that their failure to file them was due to reasonable cause and not wilful neglect. We hold that respondent did not err in determining that they are liable for additions to tax for the years 1949 and 1951 through 1954 under Section 294(d)(1)(A). Having held that the assessment of any deficiency for the year 1950 is barred by the statute of limitations, petitioners are not liable for any addition to tax for that year. Additions to tax for understatement of estimated tax. Respondent determined that petitioners are liable for additions to tax for underpayment of estimated tax for each of the years 1955 and 1956, under Section 6654(a) of the Internal Revenue Code of 1954, which provides, in part, as follows: In the case of an underpayment of estimated tax by an individual, except as provided in subsection (d), there shall be added to the tax under Chapter I for the taxable year an amount determined at the rate of six per cent per annum upon the amount of the underpayment * * * for the period of underpayment * * * Since there was no evidence that petitioners had made any payments of estimated tax for these*269 years, the foregoing provisions are applicable here. Decisions will be entered under Rule 50. Footnotes1. Findings hereinafter made with respect to any of these conceded checks will be marked with the letter "C" to indicate that such item has been conceded to be a personal withdrawal by Foster.↩2. Inasmuch as only portions of some checks are in issue, there will be duplication in the total of the number of such checks in items conceded and items in issue. ↩3. The total of nonconceded checks for 1950, listed on page 2 of Ex. 274-Jt., is $75,157.28. To this amount has been added $280.84, the portion of check No. D100775 not conceded to be personal in Ex. 53-Jt. The checks in dispute for 1950 include four checks payable to Hugh Foster, petitioner's father, dated 2-10-50, 3-25-50, 8-14-50, and 9-29-50, in the aggregate amount of $31,000. Each of the first three of these checks was in the amount of $10,000 and the fourth was in the amount of $1,000. Petitioners have since conceded on brief (pp. 22-23) that the three $10,000 checks were personal to Grant Foster, and it is not clear whether that concession was intended to cover the $1,000 check as well. However, they make no separate argument in respect to that $1,000 check, and their subsequent treatment thereof as well as of a $300 check to Mrs. Hugh Foster which was also included among the 15 disputed checks (brief, p. 25), indicates that they intended to concede all four of the checks aggregating $31,000 to Hugh Foster and the $300 check to Mrs. Hugh Foster. Thus, the number of checks in controversy for 1950 is reduced to 10, and the aggregate amount thereof is correspondingly reduced. ↩4. The total of the nonconceded items for 1951, listed on page 3 of Ex. 274-Jt., is $207,154.86. This amount has been reduced by $14,638.45, the amount of check D101276, dated 12-7-51, payable to Carson Airplane Service, because the parties in paragraphs 200, 201 and 202 of the Stipulation have made concessions which determine the tax consequences to petitioners resulting from the issuance of this check. When $14,638.47 is subtracted from $207,154.86, the total of the nonconceded items amounts to $192,516.41. To this amount has been added $10,000, the one-half of the $20,000 check D101264, dated 10-30-51, which petitioners do not concede to be personal in Ex. 53-Jt. and which respondent does not list among the items conceded to be corporate expenditures in Ex. 52-Jt. The addition of this $10,000 brings the total of the nonconceded checks for 1951 to $202,516.41. ↩5. The total of the nonconceded checks for 1952, listed on page 4 of Ex. 274-Jt., is $315,000.04. To this amount has been added $10,000 and $2,500, representing the portions of checks No. D101409 and D101473, respectively, not conceded to be personal. ↩6. Total of nonconceded checks for 1955 on Ex. 274-Jt, is $416,697.01. This has been reduced to $311,697.01 because $105,000 has since been conceded to be personal in Supplemental Stipulation, [*] 3.↩*. Check D100770 in the amount of $33,500.00 was used by Grant Foster as a deposit on an airplane. The airplane company returned $21,000 of this amount to Foster who deposited $11,000 in his checking account and $10,000 in his savings account. The remaining $12,500 was left on deposit with Pacific Aircraft Sales and subsequently applied as a down payment on an airplane purchased and used by Foster Construction, C.A. ↩**. This was a check for $5,000, of which $2,500 was deposited as set forth above. ↩***. Although this check was dated 7-7-49, prior to the opening of the Foster Construction, C.A. account on August 2, 1949, it was in fact deposited on August 12, 1949 and represented a withdrawal of corporate funds for Grant Foster's personal benefit. ↩****. This was a $20,000 check, $10,000 of which was deposited in Savings Account XXXX, and $10,000 used to purchase a cashier's check which was used in March 1952 as down payment on Mesa property purchase, as hereinafter noted. This was a $20,000 check, $10,000 of which was deposited in Savings Account XXXX, and $10,000 used to purchase a cashier's check which was used in March 1952 as down payment on Mesa property purchase, as hereinafter noted. ↩*****. One-half of this check, or $10,000, conceded by petitioners to be personal.↩7. Facts relating to the purchase of the Mesa property are hereinafter set forth under the caption "The Mesa Property - Retsof".↩*. Check No. B110385 was charged by the Bank of London-New York on August 16, 1949. ↩**. See footnote 3, as to these checks.↩8. Petitioners have conceded $75,000 and $20,000 of these checks, respectively.↩*. Certificate 020 is missing from the stock book. The stub states that certificate 020 was issued to Foster Construction, C.A. on September 9, 1954, and that certificate 028 was substituted for certificate 020. ↩**. Certificate 026 was issued to Thornburg in payment of a debt owed to him by SALA for money he had advanced, and for services he had rendered to it.↩*. These amounts were charged to an account labeled "Grant Foster" on a ledger sheet maintained in Whiteside's office. ↩**. These amounts were charged to an account labeled "Grant Foster - The Springs" on a ledger sheet maintained in Whiteside's office. ↩***. These amounts were charged to an account labeled "Retsof of Miami, Inc." on a ledger sheet maintained in Whiteside's office. ↩****. These amounts were charged to an account labeled "FOSTER CONSTRUCTION, C.A." on a ledger sheet maintained in Whiteside's office. ↩*****. This amount was charged to an account labeled "T. A. WHITESIDE, Trustee - Foster" on a ledger sheet maintained in Whiteside's office. ↩******. These amounts were charged to an account labeled "T. A. WHITESIDE, TRUSTEE - RETSOF OF MIAMI" on a ledger sheet maintained in Whiteside's office.↩9. This check has been conceded by petitioners to be personal.↩10. The issue as to several of them has been resolved by a supplemental stipulation of facts filed after trial and by certain concessions on brief.↩11. Section 275(c) of the 1939 Code and Section 6501(e)(1)(A)↩ of the 1954 Code provide that where there has been an omission of more than 25 percent of gross income the tax may be assessed within 5 or 6 years, respectively, after the return was filed. Our findings show that the deficiency notices as to 1953 and 1954 were sent within those periods, and the deficiency notices as to 1949 and 1952 were sent within the applicable 5-year period as extended by waivers.12. Indeed the 1949 return itself admits liability for the 25 percent addition to tax required by Section 291(a)↩.